## AYRES v. MOORE.

Where the vendor remains in possession of personal property sold, it is not sufficient as against creditors, that the consideration be bona fide, and the bill of sale recorded. It must appear that the sale was not made to hinder or delay creditors; and this is to be determined by the jury from all the circumstances.

WILLIAM MOORE, in 1827, instituted an action of trespass against Ayres, in Jefferson Circuit Court, for taking and conveying away a negro boy, named Tom, which he claimed as his property. Ayres pleaded not guilty, and also, in justification, that he had, as sheriff of Jefferson county, levied on the slave, as the property of James B. Moore, by virtue of an execution against him. At the trial at March term, 1828, a verdict was found for the plaintiff for $210 damages. Ayres took a bill of exceptions, and by writ of error, brought the cause to this Court.

The bill of exceptions shews that the plaintiff below, W. Moore, relied on an absolute bill of sale of the slave, made to him by J. B. Moore, under seal, in March 1825, for the consideration of $225, which W. Moore undertook to pay for J. B. Moore, at Christmas, 1825, and which he duly paid. The bill of sale was recorded in July, 1825. The sale took place at the house of the vendor, when the slave was delivered by putting his hands into the hands of the purchaser, who afterwards went home, leaving him in the possession of the vendor. About six weeks afterwards, W. Moore took the boy home, and during six more weeks, he went backwards and forwards, from the house of W. Moore to that of James B. Moore, but remained mostly with James B. After this time, he was permanently retained by the purchaser. Ayres offered in evidence another mortgage, subsequently made by J. B. Moore, of the same negro, to one Brittain, who forcibly took possession of the boy and retained him twelve months, after which his debt being satisfied by J. B. Moore, he surrendered him to the two Moores, and he again went into the possession of W. Moore. He further proved that an execution in favor of one Roberts, against J. B. Moore, who was insolvent, came to his hands in November, 1826, and another one on the

same judgment in September, 1827, on which last he levied on the slave and sold him as J. B. Moore's property. The counsel for Ayres requested the Court to instruct the jury, that "if they believed the possession did not accompany and follow the bill of sale from J. B. Moore, to the plaintiff W. Moore, at the time of its execution, that then the said bill of sale was fraudulent in law, as against creditors and subsequent purchasers." This charge the Court refused, but instructed them, "that if they believed the consideration of the bill of sale was *bona fide*, and that it was recorded within six months after its execution, it was good and valid in law; though the negro remained in the possession of the vendor, James B. Moore, previous to that time."

BARTON and PECK, for the appellants. The instruction given was erroneous; a *bona fide* consideration, means only a valuable consideration, and the transaction may be fraudulent as to creditors, notwithstanding a valuable consideration be given, for it may have been entirely inadequate; or even if equal in value to the property, yet the sale itself may have been made in bad faith; that is, with intent to hinder or delay creditors; [a] the price being more easily secreted from creditors than the property. The intention of the parties should therefore have been left to the jury, that they might inquire if they were honest. Again, though a full price may have been given, yet the real inducement and moving cause for the sale may have been enmity to the creditor, and the sale made for the express purpose of frustrating the creditor, and if so, by the statute, the sale is void. By the instruction given, immaterial how small or inadequate the consideration, yet if valuable, or in the language of charge, *bona fide*, the purchaser must succeed, to the prejudice of honest creditors; or if equal to the value of the property, however fraudulent or villainous the intentions of the parties, yet they stand protected. By the bill of exceptions it appears that no explanation was given why the property was suffered to remain in the possession of the vendor. This matter unexplained, renders the whole transaction in law fraudulent.[b]

[a] 5 John. R. 258.
2 Cowen, 431.

[b] 2 Cow. 431.
2 Bos. & Pul.
59. 8 John.
446, 9 John.
197--337.
Cowp. 434.
2 Term R.
567--594. 1
Cranch. 316.
Laws of Ala.
244--5.

SHORTRIDGE & ELLIS, for the appellee.

By LIPSCOMB, C. J. It is not material in disposing

43

Ayres
v.
Moore.

of this case, that we should notice the many points in detail made by the counsel for the plaintiff in error in his very able and learned argument, embracing a review of our statute of frauds, and its analogy to those of Elizabeth and of Charles. It will be sufficient for the present to examine a part of the charge of the presiding Judge, as presented by the bill of exceptions. The Judge charged the jury that if "they believed the consideration of the bill of sale was *bona fide*, and that the same was recorded within six months after the execution thereof, it was good and valid in law, though the negro remained in the possession of the vendor previous to that time." In this charge the presiding Judge is supposed to have erred. The case of *Hobbs v. Bibb,* [a] decided at the last term of this Court, presented this question: is the possession remaining with the vendor after an absolute sale, a fraud *per se*, or only a badge of fraud? It never was contended, but that such possession remaining unbroken with the vendor, was at least a circumstance from which fraud must be inferred, if it was not explained. In that case, it was ruled on much consideration, that it was not fraud *per se*, but a badge of fraud. Many circumstances might doubtless be given in evidence, to satisfy the jury, that a transaction was perfectly fair, honest and harmless in its operations, although the possession had not been changed. In the case of *Bissell v. Hopkins,* [b] Chief Justice Savage thought the circumstance of the horse being necessary to the vendor or mortgagor in finishing his crop, important in explaining why the possession remained with him. In like manner, it would have been competent to have explained away the inference of fraud in the case under consideration, by proving that the boy was too young to render any service to the vendee, and that he had been permitted to remain with his family during his tender years, or that it was not, from the circumstances of the case, at all convenient to take him home. And what was still more important, that the sale was publicly known, and that no person had been deceived by such possession remaining unchanged. If the jury were satisfied that the presumption of fraud had been sufficiently explained and rebutted, and that no person, who had used ordinary prudence, had been deceived, then they should have found for the plaintiff. It is not sufficient however, that the consideration be *bona fide* paid, if the purchaser knew that the sale was made with a view to defraud creditors, although the pos-

*a* Ante, p. 54,

*b* 2 Cow. 431.

session had been changed; nor would publicity in such a transaction give it any additional validity. If the law had required a bill of sale to be recorded, the record, when made, would be sufficient notice of the fact of the existence of such bill of sale; but it would still remain with the jury to be satisfied from the circumstances that it was not fraudulent, if the possession remained unchanged. The objection to the charge given is, that it might be true that all the facts embraced in the charge, had been proven, and yet, that it would not constitute a legal title against subsequent creditors or purchasers for a valuable consideration. The law not requiring bills of sale of personal property to be recorded, the record could not of itself be notice. And if notice had been given to all the world, and the consideration was ample and *bona fide* paid, if it was made with a view to defraud creditors, and such design was known by the purchaser, the title would be void. We think then, that the charge of the Court limited the inquiry of the jury to two facts, not sufficient of themselves to constitute title and to remove the presumption of fraud arising from the possession remaining with the vendor, and that the judgment must be reversed, and the cause remanded.

By JUDGE SAFFOLD. This case involves a question deeply affecting the commercial interest of this and other countries; one on which the opinions of Courts of high respectability have varied, and on which my own opinion does not strictly accord with the views entertained by some of the other members of this Court; and as this is the first opportunity I have had in this Court, I avail myself of it, to express my separate views on the question, though we are unanimous in the conclusion respecting this case.

It may be doubted whether the exceptions, as taken and allowed, fully explain the instructions given. It is probable, from the language employed, that the idea conveyed, or intended to have been, was so far different, as to have informed the jury if the consideration was sufficient, the contract *bona fide*, and the bill of sale recorded within the time mentioned, the fact of the vendor having remained in possession for some time thereafter, did not, by legal construction invalidate the sale. This presumption is strengthened from the opposite nature of the instructions prayed and refused, that the circumstance of

the possession remaining with the vendor, after the absolute sale, constituted fraud *per se.* The record however, must be disposed of in the form in which it is presented. The recording the bill of sale, admitting it to have been immaterial, could operate no prejudice to any one. If, therefore, the charge could be construed as attaching no particular importance to it, and as giving only the instruction, that the want of possession did not avoid the sale, the opinion would have the sanction of the late decision of this Court, in the case of *Hobbs v. Bibb.* *a* But according- ing even to the principles of that decision, the charge, as expressed in the exceptions, if sustained, would tend to mislead, and farther increase the temptation to fraud. It would protect every bill of sale, if recorded, and founded on a valuable consideration; regardless of the deleterious consequences to society arising from secret contracts for moveable and fluctuating property, and titles vested in others than the ostensible owners; or of whatever fraudu- lent intent or purpose in the contracting parties, or preju- dice to those who may have given credit or delayed their remedy on the faith of the apparent ownership. It would also deny the jury right to infer fraud from the most suspi- cious circumstances; and with others that of a failure to trans- fer the use and possession, however inconsistent with the nature and avowed object of the contract; which circum- stance alone, has uniformly been adjudged a badge of fraud by many tribunals of the highest authority.

*a* Ante, p. 54.

The suppression or detection of fraudulent conveyances is difficult, and often impossible under any system; and under the principles of the decision in *Hobbs v. Bibb,* I anticipate the greatest injustice in many cases. Whether the evils would be equal under the contrary doctrine, does not admit of as full demonstration by language, as from practical observation. Yet it will be admitted, that fair dealers would find no difficulty in avoiding that an in- solvent person person should, with their consent, have the use and possession of their honest acquisitions, under a con- tract absolute in its nature and terms and importing a con- trary possession; and when there is no moral or physical incompetency in reference to the parties or subject of the contract. Nor would there appear to be any unreasonable rigor in a rule that would require of others, when it becomes necessary for any legitimate purpose to deposit or leave their chattels in the possession of one who may gain a spu- rious credit on the faith of them, to express in the bill of

sale, or other evidence of the contract, the agreement res-
pecting the possession and the object of it. Then the mo-
tive alone would be subject to scrutiny; the rule if ad-
hered to, would soon be understood as well as other prin-
ciples of law; and that it would aid the cause of justice,
can hardly be doubted.

Contested facts on issues of fraud, as well as others, are
proper for the consideration of juries; but "fraud is a
question of law, when the facts are ascertained;" and
whenever a contrary doctrine shall have been riveted on
the community by judicial decisions, a great and momen-
tous change will have been effected in the jurisprudence
of the country. When it shall be conceded that a fraudu-
lent debtor, who can negotiate a private understanding
with a friend to that effect, may execute an absolute convey-
ance of his property, prove a valuable consideration pass-
ing between them, and retain his property in despite of
creditors; that he may thus enjoy his property, unless the
creditor can be so fortunate, under the covert agreement,
as to unmask the artifice, and make proof to the satisfac-
tion of a jury, that the consideration has been returned, or
otherwise, that the contract was in fact designed to ope-
rate as a fraud on creditors; then it will appear, that the
most matured legal doctrines of many of the most enlight-
ened ages and countries, have been but visionary phantoms;
that a host of English Judges, who have illumined half
the globe; that the entire Federal Judiciary of the Union;
together with the Supreme Courts of two thirds of the
States, have long been in gross delusion; and that lately,
Chief Justice Savage, and his associates and reporter, have
kindled a new light of instruction, more dazzling than any
produced by the few who had preceded them on that side
of the question.

The case to which we are thus indebted, is that of *Bis-*
*sell v. Hopkins.* [a] The facts were, that a debtor executed [a] 2 Cowen,<br>431.
a bill of sale for a horse and other articles, to Hopkins, to
provide for the security and payment of a pre-existing
debt. It was expressed, that the articles should be ap-
praised by a person named; and upon payment being
made in the articles, or otherwise, the surplus and remain-
ing articles should be released. The appraisement took
place next day, at less than the debt due, and was then
indorsed on the bill of sale by the appraiser. Thus the
contract stood for fifteen months, when another settlement
took place, at which a balance was struck of a less amount

remaining due.    Then the debtor executed another instrument to the same creditor, on the same paper, mentioning the balance, and agreeing that so much of the property "as remained on hand," should remain liable; and that the horse, which remained on hand, "was to remain for the present," with the debtor.    During all this time, the property had remained in the possession and use of the vendor, by the permission of Hopkins.    At the time of the first contract, the vendor was indebted to other persons, and one of them, Bissell, about six months thereafter, sued him and obtained judgment; and a few days after the second agreement with Hopkins, issued out execution, and directed the sheriff to levy on the horse in the vendor's possession.    The horse was sold by the sheriff to Bissell, who had notice before the sale, (and as the Chief Justice thinks, probably before he sued,) of the claim of the vendee.    The question of the right of property arose in an action of trover, by *Hopkins v. Bissell*, in which a recovery was had by the plaintiff, and the judgment was affirmed in the Supreme Court.

Here, it is true, the language of the Court embraces the contested doctrine; for the Chief Justice says, in reference to a contrary decision by Chief Justice Kent, in the same Court, "that the learned Judge, no doubt, intended to say, as in *Barron v. Paxton*, [a] that possession continuing in the vendor, is only *prima facie* evidence of fraud, and may be explained.    The question is, in every case, whether the act done is a *bona fide* transaction, or whether it is a trick and contrivance to defeat creditors."

But the more essential principles of the doctrine were not necessarily involved in that case; the avowed object of the contract, as shewn by the expressions of the instrument, was to secure the payment of a pre-existing debt; and was so considered by the Court who decided it; for the Chief Justice says, "the bill of sale was clearly a mortgage, payable on demand, and I can see no grounds for the imputation of fraud in fact; nor do I conceive the facts such as to constitute legal fraud.    It is very distinguishable from *Twyne's* case."

He takes no notice of the cases of *Edwards v. Harbin*, [b] of *Hamilton v. Russell*, [c] or scarcely any of the numerous cases in either country, in which the doctrine of constructive fraud is maintained.    Nor does he lay any stress on the distinction usually admitted between absolute and conditional sales, such as was taken in the leading

a 5 John. 261.

b 2 T. R. 587.
c 1 Cranch,
  309.

case of *Edwards v. Harbin*, "that if the vendee took an absolute bill of sale, to take effect immediately by the face of it, and agreed to leave the goods in the possession of the vendor for a limited time, such an absolute conveyance, without the possession, was such a circumstance *per se*, as made the transaction fraudulent in point of law." Yet, that if the want of immediate possession be consistent with the deed, as it was in the case of *Bucknal v. Rois-ton*, [a] and *Cadogan v. Kennet*, [b] and as it is, if the deed be conditional, and the vendee is not to have the possession until the condition is performed, the sale was not fraudulent, for there the possession accompanied and followed the deed, within the meaning of the rule. The essential principles of the doctrine were recognized by Judge Buller, in the case referred to, and have been admitted by most of the subsequent decisions, in maintaining the existence of constructive fraud; that there is a necessary distinction between deeds and bills of sale which are to take effect immediately, and such as are to take effect at a future time, or on a future event; that the possession must not be inconsistent with, but subservient to the object of the contract, and that this is all that is meant by the rule, that the possession must accompany and follow the deed. Pursuing this idea, Judge Buller remarked, "we are all of opinion that if there be nothing but the absolute conveyance, without the possession, that, in point of law, is fraudulent." Chief Justice Marshall, in the case of *Hamilton v. Russell*, after reviewing the decision by Buller, observes, "this Court is of the same opinion. We think the intent of the statute is best promoted by that construction; and that fraudulent conveyances which are made to secure to a debtor a beneficial interest, while his property is protected from creditors, will be most effectually prevented, by declaring that an absolute bill of sale is itself a fraud, unless possession "accompanies and follows the deed." This construction, too, comports with the words of the act; such a deed must be considered as made with intent to delay, hinder or defraud creditors." This latter decision was made under a Virginia statute, considered similar, in respect to fraudulent conveyances, to the acts of *13th* and *27th Elizabeth;* all which were at that time, as they have uniformly been elsewhere, adjudged only declaratory of the principles of the common law. The statute of this State is substantially the same, and entitled to the same construction.

JANUARY 1830.

Ayres
v.
Moore.

a Prec. in Ch.
285.

b Cowp. R.
432.

It is shewn that the case of *Bissell v. Hopkins,* embraced a bill of sale, the object of which did not require immediate delivery of the property; the chief inconsistency was that the first contract purported a delivery of the property, which was not intended; but the second agreement, and which preceded the creditor's lien, was free from this objection. It expressed, that the vendor was, for the time, to retain the possession, and explained as the former had done, that the motive was the security of the debt. Thus it appears, that the result of the decision is reconcileable with the more current doctrine; so far at least, as to place the case on its own peculiar merits; and that it is distinguishable from the leading cases in which the doctrine of constructive fraud has been sustained.

The reporter has subjoined to that case, a note in which he has enumerated a variety of exceptions to the rule; a sufficient number, as he thinks, to destroy it. This effort has been elaborate and ingenious; but to such as have taken the trouble to examine the supposed exceptions, and test them by the true rule, they will appear less imposing. Exceptions are the consequence of all general rules, and do not necessarily impair their value. Several of the reporter's collected cases are entirely consistent with the rule, not, however, according to his assumption of it, "that unless a change of possession follows immediately, it is not only evidence of fraud, but *per se* makes the sale fraudulent and void." The rule as recognized by the cases already cited, of *Edwards v. Harbin,* and *Hamilton v. Russell,* and also of *Dawes v. Cope,* [a] to which he refers for it, is in substance, only that the possession shall not be incompatible with the object of the deed, or that it shall be consistent with its spirit and intent.

Public sales, whereby notoriety is afforded of the change of title, and the proceeds are once applied to the benefit of creditors; or where, at least, the sale is made through the agency of an officer, so as to furnish indifferent evidence of the motive of the transaction, are, I think, on principle and the best authority, to be viewed in a different light, and must depend on the existence of fraud *in fact.* Nor can there be any doubt of the propriety of withholding the application of the rule of possession where the reason of it more obviously fails, as where the creditor is knowing and assenting to the terms of the sale; where

[a] 4 Binn. 265.

the conveyance being free from other objections, is in the nature of a marriage or family settlement; where a change of possession is impracticable, or repugnant to the vendee's right or interest, or where it is inconsistent with the purpose, as in case of an assignment by an insolvent to a trustee who advertises the sale immediately for the payment of all the creditors; where the possession is concurrent or doubtful, it may become proper for the consideration of the jury. The cases here enumerated are conceived to embrace identically or by analogy, most of the collected exceptions to the rule, admitting the farther exception of conditional sales, and which furnish a large portion of the reporter's collection, but which, as I will presently attempt to shew, form a distinct class, depending on different principles.

It may however be here remarked, that several of the decisions relied on by the reporter, must be questioned; among others the case of *Brooks v. Powers.* [a] The sale of the oxen by the tenant to his landlord, in payment of the rent, under an agreement that the former, a debtor, should retain the possession and use of the oxen to carry on his farm, and the fact that they did so remain, until seized under attachment, was a fraud in law, unless protected by a statute favorable to landlords; and the case of *Howell v. Elliott,* [b] where an absolute bill of sale for a horse, was taken as a security for a debt, and the property, after having been left with the vendor, and so kept for six years, was seized on execution by another creditor; the Court decided that such a transaction was only presumptive evidence of fraud for a jury, and the jury having found no fraud in fact, the verdict was sustained. If this was not a fraudulent sale, both in law and fact, it is difficult to imagine one. Perhaps such cases as these should be considered, not as done by the reporter, as exceptions to the rule of fraud, but as exceptions to the learned decisions of the Courts in which they were rendered. With respect to conditional sales, though highly respectable tribunals have applied, and continue to apply this doctrine indiscriminately, even to mortgages, yet I cannot conceive such application authorised either by the leading cases or the principles of reason or necessity, only so far as the reason of the rule affects them by analogy. I take the reason of the law to be, that the continuance of the vendor in possession after a sale, importing a transfer of possession, tends to give the vendor a false credit, and

*a* 15 Mass. R. 244.

*b* 1 Badger & Dev, 76.

44

JANUARY 1830.

Ayres
v.
Moore.

is suspicious, by reason of the inconsistency; that the probable effect is, "to delay, hinder or defraud creditors," and the parties must be presumed to have intended what naturally flows as a consequence of their acts; and also, that less rigor affords facility to contracts on ficticious considerations, creating colorable liens on property. And though it is true many sales, in form conditional, have been, and may be created, that are fully obnoxious to the same legal objection; yet that a material distinction exists, is sufficiently apparent, as well from necessity as a series of decisions under the common law and statutes of *Elizabeth;* previous to the bankrupt act of *21st James I.,* this act subjected to the commission of bankruptcy all chattels which the bankrupt used and possessed as owner, though they had never been his. And the same distinction has been since observed, except in cases falling within the legitimate or spurious influence of the bankrupt law. The

*a* 1 Vesey, 348.

*b* 1 Burr. 467.

case of *Ryall v. Rowles,* *a* which was on a mortgage, and held subject to the rule of possession, as also *Worsely v. Demuttos & Slader,* *b* were under the bankrupt act, and governed by it. I am free to concede, that some of the modern, as well as earlier decisions, have blended the true doctrine, under the various statutes declaratory of the common law, with the principles of the bankrupt law, and have failed to preserve the necessary distinction between absolute and conditional sales. It cannot, however, be tolerated, that a mere agreement, though expressed in the deed, if incompatible with its object, can obviate the objection of fraud. The validity of the sale must depend on the circumstances, "and it must appear to be for a purpose fair, honest and necessary or conducive to some fair object in view. Appearances must not only agree with the real state of things, but the true state of things must

*c* Kent's Com. 412, & Clow v. Woods, 5 Serg. and Rawle, 275.

*d* 1 Gall. 423.

be honest and consistent with public policy." *c*

It is remarked by Judge Story, *d* that "these principles of the common law are undoubtedly founded upon the consideration, that possession of personal chattels constitutes the ordinary *indicium* of ownership, and that the greatest public mischiefs would arise, if secret and unavowed transfers might overreach the attachments of creditors. It would enable debtors to hold out false colours, and protect conniving contracts from the animadversions of the law. The mischief would be still greater, as to sheriffs and other public officers. They must act at their peril, and where the debtor is in the open and visible possession of

property, exercising acts of ownership, they are compelled to seize it on the proper judicial process; and great indeed would be the hardship if their proceedings could be overhauled in an action of tort, where the utmost diligence and care could not protect them from deception. Upon principle, independent of authority, it would seem that substantial justice would require that a party who has a secret transfer of property left in possession of the original owner, should be held to waive his right in favor of creditors and public officers, even if the case were not held infected with fraud. *Vigilantibus non dormientibus leges subservient.*" Another consideration in support of this principle, is, that in all cases where it can apply, the equity is at least equal against the validity of the sale, even if the sale be *bona fide*. The contest is between claimants alike meritorious, and the struggle is, which shall lose, whether the vendee, who has permitted a failing or insolvent debtor to continue the possessor and apparent owner of the property, or a creditor in the ordinary pursuit of his debt, and which has probably been contracted, or the collection delayed on the credit of the debtor's visible property; certainly the loss should fall on him who has contributed to the means of procuring a false credit.

It is much less important to justice, whether the judge or jury determines the question, than that the law should be correctly administered. Yet, if the law and policy of the country dictates the necessity of constructive fraud in relation to any transactions, I think no other can more imperiously demand it, than the case of an insolvent, who has absolutely conveyed his property at private sale, under an agreement that he shall retain it, and who has, by the permission of the vendee, continued the visible and reputed owner, and thereby acquired the means of continuing his credit; and also procured time to squander, or in some way place the proceeds beyond the reach of his creditors, if, according to the secret fact, any consideration was given. Under such circumstances, it is an outrage on common sense, to deny but that the debtor has the means of practising deception and fraud on the community, which otherwise he could not have. It is a fact, in its nature, often unsusceptible of proof, whether any or how many of the creditors have casually received information of the sale; and if the sale be void as to one creditor, whose debt is equal to the value of the property, the ef-

fect on the contract is the same as if void as to all; more-over, the law has established the priority and equality of debts; therefore, a sale which is void at law as to one creditor, is void as respects them all.    But perhaps it is sufficient for the judiciary to expound the existing law, until it is authorised to modify it; and as it has uniformly been conceded by all who have most adorned the annals of jurisprudence, that whether a transaction be fair or fraudlent, is often a question of law; that it is the judgment of law of facts, and intents, I am constrained to consider the principle so established, except so far as I am controled by contrary decisions of this Court, and while they prevail.    Then certainly, where material facts, or material intents are disputed, and so far as they are contested, they are to be submitted to the jury under the instruction of the Court as to the law; it being then a mixed question of law and fact.·    But shall the Courts shrink from their province, and do less? Shall the Judge only say to the jury, that though the want of possession is *prima facie* evidence of fraud, it is subject to explanation to the satisfaction of the jury, and under whatever circumstances submit the farther decision to their discretion? In contests between suspicious or masked vendees and creditors, where the vendor being in failing circumstances, has remained the visible and reputed owner of the property, and enjoyed all the means of deluding the public by procuring false credit; or where there is no evidence of a legal consideration; or where only matter tending to excite sympathy, or something rather in the nature of collusion than legal merit, is relied on·to remove the objection to the validity of the sale, what is the legal course? Shall the judge simply submit the question to the jury, whether the parties to the contested sale have acted in good faith or meditated fraud, and instruct them to govern ·their decision. accordingly? Or shall he instruct them, that according to a supposed state of facts, if they find them to exist, the sale is, or is not fraudulent? The decisions of the Court, as expressed in this case, and in the case of *Hobbs v. Bibb,* [a] do not explicitly determine, but leave an inference favorable to the general submission to the jury.    If such be the course adopted, this state must become subject to an infinite variety of laws of property, and the due responsibility of the bench is trsnsferred to the jury box; for then the legal principle of decision is smothered, and placed beyond the reach of revision by the Supreme Court; and as Chancel-

*a* Ante, p. 54.

lor Kent remarks, "fraud in fact is reluctantly drawn by a jury, and their sympathies must be overcome by strong and positive proof before they will readily assent to the existence of a fraudulent intent, which is so difficult to ascertain, and frequently so painful to infer." By the different course suggested, the jury is excused from responsibility incompatible with their organization, and we might expect, at least, uniformity of principle from either the Circuit or Supreme Court.

The doctrine of constructive fraud, was directly involved in a case before the Supreme Court of New York, as late as 1827. [a] The same Court, on whose authority in the previous decision, [b] the idea of constructive fraud is mainly resisted. The bill of sale was for one half of a sloop, absolute on its face, and for a valuable consideration; but the vendor agreed by a written memorandum, executed at the same time, to allow the vendor, who was embarrassed, twelve months to redeem the property. The transfer was immediately entered at the custom house, and new papers taken out in the names of the vendee and the other joint owner. Less than one fourth of the amount was paid by the vendor in a short time, towards the redemption of the sloop. Afterwards, and within about one month after the sale, other creditors obtained a large judgment against the vendor, who had remained in the possession and control of the vessel, as agent of the owners. These are, substantially, the facts on which the Circuit Judge decided, "that the bill of sale was fraudulent as to creditors in judgment of law, and refused to suffer the case to go to the jury." The Supreme Court affirmed the decision for the same reason.

It is only deemed necessary farther to notice, that the case of *Steward v Lombe*, [c] decided in 1820, by the Court of C. B. which more than any other English deceision, is supposed to have shaken the authority of the case of *Edwards v. Harbin*, did not necessarily involve the question of constructive fraud, or whether actual possession was necessary to transfer the property in chattels. It is true, some of the Judges intimated doubt respecting the extent of the authority, but they all agreed, that the two cases were clearly distinguishable, and that their decision did not conflict with the other. The case of *Steward v. Lombe*, was on a mortgage, and the article in contest was a windmill. The question was, whether it should have been severed from the land, and the possession transferred.

*a* Stutson v. Brown, Cow. 732.

*b* 7 Bissell v. Hopkins.

*c* 1 Brod. & Bing. 506.

Ayres
v.
Moore.

The Court decided, that "whether the mill was legally a fixture or not, it was at all events actually fastened to the land, and it was not to be expected the mortgagee should come to reside in a mill, or that he should turn miller in order to take possession of his security;" and that it was "very different from the case of goods, capable of being transferred from hand to hand; the possession of these by a supposed vendor, after sale, may be a badge of fraud."

Upon a full view of the subject, I conclude that the doctrine of constructive fraud, and of the necessity that the possession of chattels shall be consistent with the deed, at least as far as I have here advocated it, is fully sustained by all the higher Courts of England, by a very large majority of all the States of the Union, and by the uniform decisions of our entire Federal Judiciary. I am therefore of opinion, if the principles of the decision in *Hobbs v. Bibb*, be sustained, that they should at all times be restricted to the narrowest ground that will allow a discretion to the jury in determining that the constructive badge of fraud has been sufficiently explained; and that the judgment in this case must be reversed, and the cause remanded.

Reversed and Remanded.

JUDGE CRENSHAW, not sitting.