GEORGE S. COE and others

*v.*

THE NEW JERSEY MIDLAND RAILWAY COMPANY and others.

31  105
51  534

31  105
60  157
31  105
62    7
62  275

1. A foreclosure suit is not a proper proceeding in which to litigate the rights of a party claiming title to the mortgaged premises in hostility to the mortgagor. Therefore, where defendants, who were per-

·Coe *v.* N. J. Midland Railway Co.

mitted to intervene in a foreclosure suit upon a mortgage made by a railroad company formed by the amalgamation or consolidation, pursuant to legislative authority, of certain existing railroad companies, sought to question and litigate the validity of the consolidation,— *Held,* that that defence would not be entertained.

2. The supplement (approved February 28th, 1849) to the act concerning corporations (*Nix. Dig. 169, Rev. p. 186*), which provides that all companies incorporated under the laws of this state, whose charters do not designate their places of meeting, shall hold their business meetings, the meetings of their directors, &c., in this state, by its terms does not apply to companies whose charters are not subject, by the terms thereof, to alteration, modification or repeal.

3. A provision in a corporation mortgage that the principal shall become due in case default be made in the payment of interest, is not in contrariety to a resolution authorizing the giving of the mortgage, which merely provides that the mortgage shall be given to secure the payment of the principal at a certain time, with interest payable semi-annually.

4. With a view to recording, a corporation mortgage may be proved by the president or secretary, if signed by them, though they signed it by order of the board of directors. They may be regarded as subscribing witnesses within the meaning of the act respecting conveyances (*Rev. p. 152 § 4*). But it cannot be proved by one who did not sign the mortgage. It is not requisite to a compliance with the statute in regard to proof of such instruments, that it should appear that the contents of the instrument were made known to the mortgagor. A record of a mortgage made by transcription from a copy of the mortgage examined by the clerk on production to him of the original, is in conformity with the requirements of the statute.

5. A railroad mortgage made to trustees without words of inheritance, but empowering the trustees, on default, to sell the mortgaged premises and to convey to the purchaser "all the estate, right, property and interest, and to the same extent as the railroad company had therein at the date of the mortgage, &c." will be rectified so as to convey a fee. The court may direct the trustees to convey all their title to the purchaser at the foreclosure sale in aid of the execution.

6. Where an act of the legislature authorizing a railroad corporation to give a mortgage, evidently contemplates a mortgage of all the estate of the company, it will be held, unless the contrary appear, that the mortgage given under the authority was intended to and did convey the estate to the full extent contemplated or authorized by the act.

7. Under a prayer for other *or* further relief in a bill for foreclosure, the mortgage may be reformed.

Coe *v.* N. J. Midland Railway Co.

8. A chattel mortgage on the equipment of a railroad, made by authority of the board of directors of an insolvent corporation, for securing the claims of directors against the corporation,—*Held*, to be invalid as against prior mortgagees of the franchises and equipment, whose mortgages were not filed (the transaction was prior to the act of 1876, *Rev. p. 924 § 86*), because the directors (they were also stockholders) had notice of the prior mortgages. Such prior mortgages, however,—*Held*, not to be valid against judgment creditors who, but for the receivership obtained in a suit to foreclose one of the mortgages, might have made a lawful, valid levy on the equipment.

9. The recovery of a judgment against a railroad company for the value of land and damages taken by condemnation, is no bar to the enforcement of a vendor's lien for the money.

10. A depot building,—*Held*, as against a mechanics lien, to be property connected with the line of the railroad, and regarded as part of the mortgaged premises which were described by a general description covering the railroad and land, ground, depots, station-houses &c., acquired and to be acquired.

11. The lien given to laborers by the act concerning corporations (*Rev. p. 188 § 63*), cannot be extended so as to impair the obligation of contracts or lien of duly recorded encumbrances antecedent to the act.

12. That the trustees under a railroad mortgage which gave them the right to take possession of the mortgaged premises in case of default of payment of interest, did not see fit to take possession after default, but permitted the mortgagors to continue in possession and operate the road, and the fact that the employes of the mortgagor were not aware, when they rendered the service, that default had taken place, gives to the latter no claim against the mortgagees for their wages.

13. The case of *Fosdic* v. *Scholl*, *U. S. Sup. Ct., 8 Cent. L. J. 298*, considered.

14. A railroad company held its rolling stock under an agreement to pay for it in installments, the title not to pass to the company until the whole sum agreed to be paid for it should be paid, and, in case of default, all previous payments to be forfeited. It became insolvent and had no money to pay an installment which became due. Directors of the company, in order to save the rolling stock, advanced the money out of their private funds, on the strength of an agreement made by the other members of the board with them that they should be subrogated to the rights of the vendors for their repayment, but no resolution to that effect was in fact passed by the board.—*Held*, that they were entitled to subrogation, subject to the superior right of the vendors as to the unpaid balance of the price.

Coe v. N. J. Midland Railway Co.

15. A railroad company permitted its charter to be used for purposes of condemnation of lands for another company's road, and on the location of the latter, which paid and took title in its own name for the land, and built the road.—*Held*, that the road was the property of the latter company. If, in such case, any of the land condemned was paid for by the former company with its own funds, which have not been repaid to it, the latter company is bound to refund the amount.

16. A railroad company having located its road, permitted another company to locate its road on the same location and to build its road upon it,—*Held*, that the former thereby relinquished its right to the location.

17. The case of *Randolph* v. *New Jersey West Line R. R.*, *1 Stew. 49*, distinguished.

18. By an agreement between two railroad companies, one, in consideration of a right to cross its road, gave the other a right to cross in future.—*Held*, that specific performance of the agreement would not be decreed where the crossing was to be at a place not contemplated by the parties, and where it would do very great damage to the former company—it would cross a drill and freight-yard.

19. That the mortgagees of the premises which it is proposed to cross, might have known of the intention to cross, from the fact of the building of a tunnel, to enter which the crossing was necessary, will not bind them to the consequences of acquiescence. In estimating damages, the value of the crossing, which was the consideration of the agreement, will be allowed.

On final hearing on pleadings and proofs.

*Mr. B. Williamson, Mr. Ashbel Green, Mr. W. S. Opdyke* of New York, and *Mr. J. W. Taylor*, for complainants.

*Mr. T. D. Hoxsey*, for stockholders of the New Jersey Western Railroad Company, and for third mortgage bondholders of the New Jersey Midland Railway Company, and Van Houten, Demarest and others, judgment creditors.

*Mr. John Linn* and *Mr. J. D. Bedle*, for R. P. Terhune, judgment creditor, and for Terhune & Olmstead, trustees in chattel mortgage; also, for Wortendyke, Watkins and others claiming subrogation.

Coe *v.* N. J. Midland Railway Co.

. *Mr. R. Wayne Parker, Mr. E. Ellery Anderson* of New York, and *Mr. Cortlandt Parker,* for E. Ellery Anderson, trustee.

. *Mr. R. Wayne Parker* and *Mr. C. Parker,* for employes.

*Mr. J. Vanatta,* for the Delaware, Lackawanna and Western and Morris and Essex Railroad Companies.

*Mr. A. W. Cutler,* for David D. Hennion and others.

THE CHANCELLOR.

The New Jersey, Hudson and Delaware Railroad Company was incorporated by an act passed March 8th, 1832 (*P. L. 1832, p. 133*); the Sussex Valley Railroad Company by an act approved March 14th, 1867 (*P. L. 1867, p. 215*); the New Jersey Western Railroad Company by an act approved March 21st, 1867 (*P. L. 1867, p. 386*), and the Hoboken, Ridgefield and Paterson Railway Company by an act approved March 15th, 1867 (*P. L. 1867, p. 720*). By an act approved March 17th, 1870, entitled "An act to authorize the consolidation of the capital stock, property, powers, privileges and franchises of the New Jersey, Hudson and Delaware Railroad Company, with those of the New Jersey Western Railroad Company, the Sussex Valley Railroad Company, and the Hoboken, Ridgefield and Paterson Railway Company, or either of them" (*P. L. 1870, p. 811*), provision was made for the consolidation of those corporations under a new one, to be known as the New Jersey Midland Railway Company. By an act approved March 31st, 1871 (*P. L. 1871, p. 1093*), after reciting that the consolidation had been effected under the act of March 17th, 1870, and that the papers relating thereto had been filed in the office of the secretary of state, as required by that act (the certificate was filed on the 13th of July, 1870), it was enacted that the consolidation be, and was thereby validated and confirmed, and that the corporations so consolidated

were, and were thereby merged and consolidated into, the New Jersey Midland Railway Company. After the consolidation, and in 1870, the New Jersey Midland Railway Company gave to George S. Coe, George Opdyke and Abram S. Hewitt, as trustees, a mortgage, dated August 1st, in that year, to secure its bonds, to the amount of $3,000,000, with interest. The mortgage conveys the mortgaged premises to the trustees as joint tenants, and not as tenants in common, and to the survivors and survivor of them, and to their successors and successor in the trust and to their assigns; and their premises are described therein as follow:

"All and singular the line of railway known and to be known as the New Jersey Midland Railway as the same is being and shall be constructed, from the state line at or near Unionville, in the state of New York, to the Hudson river, including all the railways, ways, rights of way, depots, ground or other lands, all tracks, bridges, viaducts, culverts, fences and other structures, depots, station-houses, engine-houses, car-houses, freight-houses, wood-houses, water-stations and other buildings, and all machine-shops, and all real or personal property held or acquired, or hereafter to be held or acquired, by the said company, its successors or assigns, for use in connection with the aforesaid railway of the party of the first part (the company), or with any part thereof, or with the business of the same, and including all locomotives, tenders, cars and other rolling stock or equipments, and all machinery, tools, implements, fuel and materials for constructing, operating, repairing or replacing the aforesaid railway, or any part thereof, or of any of the equipments or appurtenances of the aforesaid railway, or any part thereof, and all machinery of all kinds, and all and singular the other personal property of any nature, kind and description whatsoever belonging to the said party of the first part (the mortgagor), wheresoever the same may be situated; all of which personal chattels are hereby declared and agreed to be fixtures and appurtenances of the said railroad, and are to be used and sold therewith, and not separate therefrom, and are to be taken as part thereof, and all tolls, incomes, issues and profits, to be had or derived from the same, or any part or portion thereof, or from any part or portion of said term or terms, or either thereof, and all right to receive and recover the same; and, also, all franchises connected with or relating to the aforesaid railway, or to the construction, maintenance or use of the same, together with all and singular the tenements and appurtenances to the aforesaid railway, lands and premises, or either thereof,

belonging or in anywise appertaining, and the reversion or reversions, remainder or remainders, tolls, incomes, revenues, rents, issues and profits thereof; and, also, all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part of, in and to the same, and any and every part thereof, with the appurtenances."

In 1871, the company gave Daniel Haines, as trustee, a mortgage on the same property, by the same description, to secure the payment of $1,500,000, with interest. That mortgage was expressly declared to be subject to the prior lien created by the above-mentioned first mortgage.

In 1873, the company gave a mortgage (known as the consolidated mortgage), dated April 30th, in that year, for $10,000,000, with interest, upon the line of railway then known and to be known as The New Jersey Midland Railway, as the same was being and should be constructed from the state line, at or near Unionville, in the state of New York, to the Hudson river, and also an extension of that railway from some point on the main line thereof, westerly of Newfoundland, in the county of Passaic, to the Delaware river, together with the extension and connection from the main line of said railway, east of Ridgefield Park to Weehawken, by a tunnel or open cut, through or over Bergen Hill, and including all the railway, ways, rights of ways, depots &c.; and the franchises connected with or relating to the railway, or the construction, maintenance or uses of the same. By that mortgage it was recited that the mortgage of August, 1870, above mentioned, was a first lien upon certain property of the railway company; that the mortgage above mentioned, of January 2d, 1871, was a second lien upon property of the company; that both of those liens were recognized as liens prior to the mortgage thereby created upon the property mentioned in the first and second mortgages, respectively, and that the amounts secured by those liens was in the aggregate four and a half millions of dollars, with interest thereon at the rate of seven per cent. per annum, payable semi-annually, and that for the purpose

of enabling the mortgagor to liquidate or satisfy those liens and liabilities, as well as for the purpose of obtaining the money and materials necessary to perfect, enlarge and extend its line of railway, and to develop and increase its terminal and ferry facilities upon the Hudson river, the mortgagor had, by a vote of its directors, resolved to borrow money to an amount not to exceed ten millions of dollars, to be secured by that mortgage; and that it was thereby expressly understood and agreed by and between the parties to the mortgage, that four and a half millions of dollars in par value of the bonds secured by that mortgage should be placed in the custody of the trustee under that mortgage, and should so remain in trust, and not be issued or withdrawn except upon the presentation and surrender to, and cancellation by, him or his successor, of an amount of the before-mentioned prior lien bonds and interest equal to the amount of those bonds so to be from time to time withdrawn from the trust; the bonds by the consolidated mortgage secured to be so withdrawn, and the prior lien bonds outstanding, to be cancelled to a corresponding amount, until all of the outstanding prior lien bonds and the coupons thereon should mature and be cancelled.

On the 8th of March, 1875, Garret A. Hobart was appointed receiver of the mortgagor on proceedings in insolvency. On the 22d of that month George S. Coe and George Opdyke, trustees, filed their bill to foreclose the first mortgage. On the 30th of March, 1875, James W. McCulloh and Garret A. Hobart were appointed receivers in the cause of the mortgaged property, and since then they have operated the railway as such receivers. The parties defendant to that suit are Jabez P. Pennington, successor of Daniel Haines, deceased, as trustee under the second mortgage; Abram S. Hewitt, trustee under the third or consolidated mortgage; Richard P. Terhune and Samuel E. Olmstead, trustees under a chattel mortgage given by the New Jersey Midland Railway Company, and dated February 12th, 1875 (it is also dated January 30th, 1875), to

Coe v. N. J. Midland Railway Co.

secure the sum of $88,588.08; the Hudson Connecting Railway Company, as claiming certain premises which the complainants insist are part of the mortgaged premises; E. Ellery Anderson, as mortgagee of the last-named company, under a mortgage dated January 1st, 1872; Oliver Robinson, as claiming under a deed or license in writing purporting to affect a part of the premises mortgaged under the first mortgage; John M. Stevenson and William W. Rand, as claiming under a deed of conveyance from the railway company, bearing date September 8th, 1871, and purporting to affect part of the mortgaged premises; Rand also claims under another like deed, dated August 31st, 1871, also purporting to affect a part of the mortgaged premises; John H. Van Houten and James C. Demarest, as claiming under a deed of conveyance from the sheriff of Passaic county to them, dated November 7th, 1874, and purporting to affect part of the mortgaged premises, and also as claiming a lien by virtue of a judgment recovered by them against the railway company in the circuit court for the county of Passaic, on or about the 9th of January, 1874, for $2,799.71; Stephen Strait and others, as claiming liens by reason of sundry judgments recovered by them respectively against the railway company; Cornelius T. Demarest and others, as representing claims of themselves and numerous other employes of the Midland Railway Company, for wages, for which they claim a lien against the income and rolling stock of the company; and the Delaware, Lackawanna and Western Railroad Company, and the Morris and Essex Railroad Company, by reason of a claim and controversy in respect to the right of those companies to cross the railroad operated by the Midland Company near the mouth of the tunnel of the former company.

Thomas D. Hoxsey was allowed to intervene as a defendant, as assignee of a judgment against the mortgagor, and also as owner of stock of the New Jersey Western Railroad Company, and of $80,000 of the third or consolidated mortgage bonds, and as owner of $20,000 of the capital stock of

8

the New Jersey Midland Railway Company; and James Jackson was permitted to intervene as a defendant, as owner of stock of that company and as owner of third mortgage bonds. Hezekiah Watkins and others, claiming liens under a claim of subrogation, were also made defendants.

Answers were filed in the cause by the following defendants: Terhune and Olmstead, trustees under the chattel mortgage; Hennion and others, judgment creditors; James Jackson; Garret A. Hobart, receiver, answering on behalf of a committee of bondholders, raising a claim as to the payment of certain interest coupons; Thomas D. Hoxsey, the Morris and Essex, and Delaware, Lackawanna and Western Railroad Companies, Hezekiah Watkins and others, Cornelius T. Demarest, the Hudson Connecting Railway Company, and E. Ellery Anderson, trustee under the mortgage of the last-named company. The other defendants have not answered, and the bill has been taken as confessed as against them. The Morris and Essex, and Delaware, Lackawanna and Western Railroad Companies filed a cross-bill in respect to the claim and controversy before mentioned. To this the complainants in the original suit answered. The Hudson Connecting Railway Company and E. Ellery Anderson, trustee, filed an original bill in the nature of a cross-bill, to which Messrs. Coe and Opdyke, trustees, filed an answer. That bill prays that the complainants therein may, as against the complainants in the original suit and the Midland Company and its other mortgagees, be decreed to be the owners of all the lands and parcels of land described in the Connecting Company mortgage, the title to which was taken in the name of the Midland Company, and that those lands may be decreed to be absolutely free from the Midland mortgages. The suit for foreclosure of the first mortgage and the cross-suits were all heard together.

Before proceeding to the consideration of the matters legitimately in controversy in the cause, the objections made in respect to the alleged defect in the consolidation

to which the mortgagor, the New Jersey Midland Railway Company, owes its existence, may be disposed of.

The consolidation is attacked by some of the defendants. They claim that, by reason of various omissions and defects, it is not valid, and that therefore the stockholders of the consolidated companies, or some of them, have rights which should be regarded and protected in this suit.

The consolidation has received the recognition, approval and confirmation of the legislature. By the act of March 31st, 1871, it was validated and confirmed, and it was enacted that the consolidated corporations be, and they were thereby, merged and consolidated into The New Jersey Midland Railway Company. It was also declared, by way of recital, that under and by virtue and in pursuance of the act of March 17th, 1870, the consolidated companies had effected the consolidation, and had filed the papers in the proper office, as required by the act. By subsequent acts (March 26th, 1872, March 27th, 1872, and February 19th, 1873), the existence of The New Jersey Midland Railway Company, as a corporation, was recognized by the legislature. It is enough, however, to say that, in this suit, a mere proceeding *in rem*, brought by encumbrancers of the consolidated company against it upon encumbrances created by it, the question raised as to the validity of the consolidation has no place. Any rights which stockholders in the consolidated corporations may have, will not be unjustly affected by these proceedings to which they are not a party. The defence set up on this head by the defendant, who has intervened in respect of his ownership of stock of the New Jersey Western Railroad Company, as well as of third or consolidated mortgage bonds of the consolidated company, questions the legality of the existence of the mortgagor and its right to mortgage the property of which it claims to be the owner, on the ground that the interests of some of the stockholders of the consolidated companies, as such, have not been acquired by it nor lost by them, but

still exist and give them a paramount claim to the property and franchises of their respective companies.

A foreclosure suit is not a proper proceeding in which to litigate the rights of a party claiming title to the mortgaged premises in hostility to the mortgagor. *Lewis* v. *Smith, 9 N. Y. 502, 514; Bogey* v. *Shute, 4 Jones Eq. 174; Jones* v. *St. John, 4 Sandf. Ch. 208; Wilkins* v. *Kirkbride, 12 C. E. Gr. 93.* This suit is not a proper proceeding for the establishment or vindication of their rights. It may be added that it would seem that, from the time when the consolidation (which must have been a matter of public notoriety) took place to the commencement of this suit, none of the stockholders whose adverse claims are now advanced have taken any measures to vindicate their alleged rights in respect of their ownership of stock in the companies consolidated, but have, apparently, acquiesced in the consolidation, and the recognition and declaration of its validity by the legislature, and in the issue and negotiation of bonds to the extent of many millions of dollars, upon the faith of that consolidation, against which they now, as it would seem, for the first time, protest.

In behalf of the second and third mortgagees and certain judgment creditors, the validity of the first mortgage is attacked, on the ground that the resolution authorizing it was passed at a meeting held out of the state (in the city of New York), and was, therefore, illegal and invalid; that the mortgage does not conform to the resolution authorizing it; that its execution was not properly acknowledged, and that it was not duly recorded in some of the counties through which the road passes.

To consider the first of these objections, that the resolution was illegal. This is based on the prohibition contained in the supplement, approved February 28th, 1849, to the act concerning corporations (*Nix. Dig. 169, Rev. Corporations § 50*), and the supposed authority of the case of *Hilles* v. *Parrish, 1 McCart. 380.* It is to be observed that that supplement, while it provides that all companies incorporated under the

Coe *v*. N. J. Midland Railway Co.

laws of this state whose charters do not designate their places of meeting, shall hold their business meetings, the meetings of their directors, and shall keep their offices and books in this state, provides, also, that the act shall not apply to any corporations whose charters are not subject, by the terms thereof, to be altered, modified or repealed. None of the charters of the consolidated companies are subject, by their terms, to alteration, modification or repeal. The general principle mentioned in *Hilles* v. *Parrish* is, that a private corporation, whose charter has been granted by one state, cannot hold meetings and pass votes in another state; but there is a well-settled distinction between corporate acts, strictly so called, acts of the company itself, as such, and the acts of its authorized agents. *Green's Brice's Ultra Vires App. 676; Jones on R. R. Securities* § *84.* In *Ang. & Ames on Corp.* §§ *124, 274,* it is said that the directors of a corporation are not a corporate body when acting as a board, and are competent to act as agents beyond the bounds where the corporation exists. See, also, *Galveston R. R.* v. *Cowdrey, 11 Wall. 459,* and *Arms* v. *Conant, 36 Vt. 745.*

Again, there is sufficient evidence of ratification of the act of the board of directors in passing the resolution in question, both by their constituents and the legislature, to remove any question as to its validity. The mortgage was executed as a corporate act, under the seal of the company and the hand of its president; it was recorded in the counties through which the railroad passes, and the money realized by the sale of the bonds secured by the mortgage was expended upon the road itself. In the second and third mortgages the existence of the first mortgage is stated, and it is recognized as a prior and a first lien on the property. The holders of the second and third mortgage bonds have taken their securities expressly subject to its lien, and the third also makes express provision for the payment, out of the loan thereby secured, of the amount of the first and second mortgages.

Nor, it may be remarked, in passing, are the rights of the judgment creditors superior to those of the second and third mortgage bondholders.

But, further, the legislature, by act of March 27th, 1872 (*P. L. 1872, p. 924*), recognized the legality of the first mortgage. After reciting that the company had provided for the issue of its first mortgage bonds in several denominations ($100, $500 and $1,000) to the amount in the aggregate of three millions, the act authorizes and empowers the company to cancel and destroy five hundred and fifty of those bonds, of the denomination of $100 each, and to issue, instead, an additional series of first mortgage bonds of the denomination of $1,000; and it provides that the additional series shall consist of fifty-five of those bonds, which shall be countersigned by the trustees, and thereupon shall be held and deemed, in all courts and places whatsoever, to be secured by that mortgage, the same as if they had originally been subject to the lien thereof.

The objection that the mortgage does not conform to the resolution authorizing it, is based upon the fact that the mortgage provides that in case of default for six months in the payment of interest, the whole principal and interest shall be due, while the resolution merely provides for the issue of bonds and a mortgage to secure the payment of $3,000,000 in twenty-five years from the 1st of August, 1870, with interest at the rate of seven per cent. per annum, payable semi-annually. But the provision under consideration is manifestly not in contrariety to the resolution. It was necessary to render the bonds marketable, and it adds nothing which the law itself would not grant; for, in the absence of such provision, upon such default and the commencement of foreclosure proceedings it would be within the power of the court to sell, if necessary, the entire premises for the purpose of raising as well the principal as the unpaid interest. *Howell* v. *Western R. R., 4 Otto 463; Rev. p. 117 § 74.*

In this connection, the objection of the lack of power on the part of the company to make the mortgage may be disposed of. The supplement (February 2d, 1854) to the charter of The New Jersey, Hudson and Delaware Railroad Company (*P. L. 1854, p. 45*), gives to that company power to make its bonds without limitation, and to secure their payment by mortgage of its real and personal estates, franchises, &c.

The charter of The New Jersey Western Railroad Company authorizes it to borrow money not exceeding in amount two-thirds of the amount of its capital stock. The charter of The Sussex Valley Railroad Company authorizes it to raise money on its bonds and mortgages of its property and franchises for any sum not exceeding $2,500,000. The New Jersey Midland Railway Company, by the act of consolidation, was clothed with all the rights, powers and privileges of the consolidated companies. The power to issue bonds under the charter of The New Jersey, Hudson and Delaware Railroad Company, it will be observed, was unlimited.

Nor is the objection to the sufficiency of the proof of the mortgage well taken. The mortgage, as before stated, was executed under the corporate seal of the company and the hands of its president, Cornelius A. Wortendyke, and its secretary, Hezekiah Watkins. The name of Eugene Smith appears as that of a subscribing witness. By the certificate of proof, which was made before a master in chancery, it appears that Mr. Watkins, the secretary, on the 17th of August, 1870, deposed that he knew the corporate seal of the company; that the seal affixed was that seal, and that it was affixed by the order of the directors; that Cornelius A. Wortendyke was the president, and signed his name to the instrument as such by the order of the directors, in the presence of the deponent, and that the latter signed his name to the instrument as secretary by like order. It also appears by the certificate, that, on the same day, Eugene Smith, the subscribing witness before mentioned, proved

the execution of the instrument by the trustees. Whether Eugene Smith was, indeed, a witness to the execution of the instrument by the company, does not appear. The signature of Hezekiah Watkins, as secretary, to the deed may well be regarded as that of a subscribing witness to the execution of the instrument by the affixing of its corporate seal by order of the board. Though the instrument is signed by both the president and the secretary in accordance with usage and the directions of the resolution, the signatures of both of those officers are placed there merely for the purpose of attesting the affixing of the seal of the company as a corporate act. The proof by the secretary is in compliance with the requirements of the statute as to the person by whom proof is to be made, and the proof itself is in accordance with law. It is objected that it does not appear that the contents were made known to the grantor, but it is not necessary that that should appear in the proof of a deed or mortgage.

Nor can the objection that, in three of the counties through which the railroad passes, the transcription by which the record of the mortgage was made, was from a copy of the instrument, and not from the instrument itself, be sustained.

The mortgage appears, according to the certificates of the clerks of the counties, to have been recorded on different days; in Sussex, on the 30th of August; in Bergen, on the next day; in Passaic, on the 5th of September, and in Hudson, on the 8th of that month. In accordance with the custom in such cases, the original mortgage appears to have been produced to the clerk, in his office, with a true copy; the two were compared by the clerk, and he then marked the original as recorded, and subsequently made the copy in the book of records from the copy left with him. On this point it may be added that, as before stated, the subsequent mortgagees had actual notice by their bonds and mortgages of the existence of the first mortgage. The

record is lawful, and was constructive notice to them and the judgment creditors.

Objection is made to the maintenance of this suit, on the ground that George Opdyke resigned his office of trustee, and that Abram S. Hewitt, also a trustee under the first mortgage, has not resigned. There is some evidence of the tender of his resignation by Mr. Opdyke, but there is no evidence that it was accepted before the beginning of the suit. There is evidence, also, that Mr. Hewitt resigned, but it does not appear clearly that the resignation was accepted. He is a party to this suit as trustee under the third mortgage, and, in view of the fact that he is a defendant, it would have been incongruous to have made him a complainant therein. There appears to be no doubt that he did relinquish the trust and that his resignation was accepted. Mr. Opdyke, notwithstanding the fact of his having tendered his resignation, has still seen fit to act as a trustee, and is a complainant accordingly. There would be no difficulty, under the circumstances, in adjusting, if necessary, the parties in accordance with the requirements of correct practice. The name of Mr. Opdyke could be stricken from the record, if it were improperly there.

By the terms of the mortgage, the estate thereby granted is granted to the trustees, their survivors or survivor, or their successors or successor and assigns, without words of inheritance. It is insisted, on the part of the defendants, Jackson, Hoxsey, Van Houten and Demarest, that the estate is merely an estate for the life of the last survivor of the trustees, and is not an estate in fee. And it is also insisted that, inasmuch as the complainants' bill contains no prayer for the reformation of the mortgage, it cannot be reformed in this suit. But, under the circumstances, the court would, if necessary to purposes of equity, permit an amendment of the bill by the insertion of a prayer for reformation.

The bill, however, contains a prayer for such further or other relief in the premises as the nature of the case may require. Under this prayer the court will find no difficulty

in granting the relief and effectuating the intention of the parties in respect to the estate. By the mortgage it is provided that, in case of the entry of the trustees, in default of payment, they may sell the premises, and, as the attorney or attorneys of the railway company thereby duly constituted and appointed, execute and deliver to the purchaser or purchasers a good and sufficient deed or deeds of conveyance in law for the property, granting and assuring to him or them all such estate, right, property and interest, and to the same extent as the railway company had therein at the date of the mortgage, or at any time subsequent thereto; and that the sale, when fully consummated, shall be a perpetual bar, in law and equity, against the railway company and all persons claiming or to claim the premises, or any part thereof, by, through or under them, subsequently to the date of the mortgage. The mortgage contains a covenant for further assurance, by which the railway company covenants to execute and deliver, or cause to be executed and delivered, all and every such further and reasonable deeds of conveyance, assignments and assurances in law for the better and more effectually vesting and confirming the premises thereby granted, or intended so to be, as may be reasonably advised, devised or required.

It will be seen that, under the provision for sale, the trustees are empowered to convey all such estate in the mortgaged premises as the railway company had at the date of the mortgage or at any time afterwards. The trustees must have been clothed with the entire estate of the company in the mortgaged premises to enable them to execute the trust, and of this fact subsequent mortgagees, judgment creditors and purchasers had notice from the record itself, the mortgage having been recorded in full. *Randolph* v. *N. J. West Line R. R. Co.*, *1 Stew. 49*. The mortgage would, therefore, be reformed, if necessary, as against all such persons.

But, further, it is within the power of the court to direct the trustees to join in the conveyance to a purchaser under

the sale in foreclosure, if it should deem it proper so to do: in which case all the estate which the company had at the date of the mortgage, or acquired subsequently thereto, would pass to the purchaser.    *Muller* v. *Dows, 4 Otto 444.*

Again, the act under and by virtue of which this mortgage was made, contemplates a mortgage of all the estate of the company, and the court will intend, in the absence of any evidence of a contrary design, that the estate which the company mortgaged to the trustees, in pursuance of that authority, was not less than was contemplated by the act.    As to the rights of way, it may be remarked that, the company's estate therein is not a fee.

The complainants' mortgage was duly executed, pursuant to lawful authority, was duly recorded, and conveys all the estate which the company had in the mortgaged premises when it was made, or at any time afterwards.

The chattel mortgage given to Terhune and Olmstead, trustees, in January or February, 1875, upon the equipment of the railroad, to secure the payment of $88,588.08, was intended to indemnify directors of the company for their loans to it, payments for it, or liabilities incurred in its behalf.    All the *cestuis que trust* (with the exception of the Union Bank of Jersey City, the Hudson County National Bank, the Delaware and Hudson Canal Co., M. K. Jessup & Co., and the receivers of the New York and Oswego Midland Railway Company) were directors of the company, and on the debts of those other persons or corporations those directors, or some of them, were liable as sureties, and the mortgage was in fact made, so far as those debts were concerned, to indemnify them against that liability.    That the mortgage was intended merely as such indemnity is evident from the resolution under which it was made.    It is as follows:

" Whereas, it has been, and is necessary, from time to time, to borrow money in addition to the earnings of the road, to enable the company to purchase rolling stock, pay interest, claims for right of way, rental of the Unionville Road, and for other purposes necessary for

the operation of the road; and, whereas, the depressed state of the securities of the company is such that loans cannot be negotiated without the personal endorsements of the directors of the company; therefore, resolved, that in order to save harmless and protect the directors against loss by reason of such endorsements, the president be, and he is hereby, authorized to execute a mortgage on the property of this company, both real and personal, to Samuel E. Olmstead and R. P. Terhune, as trustees, for the protection, security and payment of such endorsed paper as will save the directors harmless from any loss whatever by reason of such endorsements, in case the said endorsed paper, notes or acceptances be not paid at maturity by the company."

The answer of Terhune and Olmstead alleges that the mortgage was given to secure the payment of money advanced to the railroad company. All the directors for whose benefit the mortgage was made, knew of the existence of the complainants' mortgage, and of the second and the third mortgages, when the resolution was passed. They are not, therefore, entitled to the benefit of the act concerning mortgages (*Rev. p. 709 § 39*); for, having had notice, they are not mortgagees in good faith. *Williamson* v. *N. J. Southern R. R. Co.*, *2 Stew. 311, 336.* Said the court of errors and appeals in that case: " Purchasers or mortgagees, in order to take advantage of the failure of another mortgagee of chattels to comply with the statute, must be subsequent purchasers or mortgagees, taking their title under the mortgagor in good faith. A purchaser or mortgagee acquiring his rights with notice of the existence of the antecedent mortgage, does not obtain his title in good faith." In their answer, Terhune and Olmstead do not allege that they or their *cestuis que trust* had not notice of the three prior mortgages.

Again, while the directors of the railroad company were not chargeable with any duty in regard to the filing of the first, second and third mortgages, or any of them, they were prohibited by their official relation to the company, and as being themselves part of the company as stockholders, from acquiring any lien by mortgage for their own security as against the mortgagees in those mortgages. As between

the mortgagees and the company, the mortgages were valid as to the chattels without filing. They were equally good against the directors and stockholders. For this reason, too, the directors, for whose benefit the chattel mortgage was made, cannot be regarded as mortgagees in good faith.

It is very manifest that the mortgage was made in view of the insolvency of the company. The resolution under which it was made, shows it. The mortgage was executed on the 12th of February, 1875. The company had then made default in the payment of the interest due on the mortgages, and on the 8th day of March following, less than a month afterwards, a receiver was appointed under proceedings in insolvency against the company in this court.

It is clear, from the proof, that the mortgage in question was the result of an attempt on the part of the directors for whose benefit it was made, to obtain security and indemnity for themselves with respect to money due them from, and liabilities which they had incurred for, the company, out of the personal property which they well knew was mortgaged to the bondholders, but which they nevertheless supposed might be available to them as against those bondholders, because of the omission of the trustees to file the mortgages. It is unnecessary to consider the other objections made to the mortgage in question. The complainants' mortgage is entitled to priority over the chattel mortgage, and so are the second and third mortgages.

The complainants' mortgage and the second and third mortgages are not valid as against the judgment creditors who have answered, and who have issued execution upon their judgments. By the delivery of execution to the sheriff they acquired a lien upon the personal chattels of the defendant in execution (the railroad company) as against all persons except *bona fide* purchasers, purchasing in market overt or under circumstances equivalent thereto. *Rev. pp. 392, 393* §§ *18, 20; James* v. *Burnet, Spen. 635, 639.* The act of 1876 (*Rev. p. 924* § *86*), which renders unnecessary the filing of mortgages of franchises and chattels combined,

provided they be duly lodged for registry, does not divest the lien of the executions under the judgments, because the executions were delivered to the sheriff before the passage of that act. *Williamson* v. *N. J. Southern R. R. Co.*, *2 Stew. 336.* The judgments of Inglis, of Van Houten and Demarest, of Terhune (assignee of Goetchius), and the judgment of Hoxsey (assignee of Vandervoort and Felch), are entitled to priority as to the chattels, over the first, second and third mortgages. *Hale* v. *Sweet, 40 N. Y. 97; Stewart* v. *Beale, 7 Hun 405; Thomas on Mort. 493.*

It is urged that there is no proof of levy under some, if there is under any, of the judgments, and that the executions issued thereon having been returned, no lien can be established under them. But it is to be remembered that the complainants made successful application for a receiver in this suit, in March, 1875. Since the appointment of the receivers, which was made in that month, the chattels have been in the custody of this court, and, therefore, the judgment creditors could make no levy thereon, as otherwise they might have done and with effect. The law rendering unnecessary the filing of a railroad mortgage of franchises and chattels, in order to hold a lien on the latter, was not passed until 1876.

The judgment of David D. Hennion and others appears to have been recovered November 13th, 1873, in the supreme court of this state, against the New Jersey Midland Railway Company, for $869.61, in proceedings on an appeal from an award of commissioners made under condemnation proceedings instituted under the charter of the railroad company, to take the land of the plaintiffs therein, and the amount of the judgment is the amount of the verdict for the value of the land and damages, together with the costs of suit. This judgment has not been paid, nor has any part of it. The plaintiffs claim for it priority in payment as to the amount awarded for the value of the land taken by the proceedings in condemnation and damages. This lien is asserted by them as being in the

nature of a vendor's lien for unpaid purchase-money, and it is insisted by the mortgagees that the judgment itself, which is a lien upon all the property of the railroad company, is a waiver of the lien, if it ever existed. But the claim, though it might be put upon the ground upon which a vendor's lien is sustained, may be better and, perhaps, more securely rested on the constitutional ground by which the right to just compensation is secured to the land owner under proceedings by virtue of the right of eminent domain.

It may also be remarked, that the charters of the New Jersey, Hudson and Delaware, New Jersey Western and Sussex Valley Railroad Companies, all provide that the money awarded to be paid on condemnation shall constitute a lien on the property of the company in the nature of a mortgage. The judgment, if it were an ordinary judgment for the amount of the award and costs, would not be more extensive in its lien than the provision of the acts just referred to, which extends to the entire property of the company, and, notwithstanding the lien under the provisions of the charters or under the judgment, the right to compensation would still be enforceable in equity against the land itself, in view of the constitutional prohibition and the provision for indemnity before alluded to. The first, second and third mortgages extend to and cover this property only by virtue of the provisions therein contained as to property to be acquired in the future. They must take it *cum onere*. *Williamson* v. *N. J. Southern R. R. Co.*, *1 Stew. 277; S. C. on appeal, 2 Stew. 311.* The preference claimed for this judgment on the land taken will, therefore, be allowed.

The defendants, Van Houten and Demarest, claim under their judgment, which was recovered January 19th, 1874, in the Passaic circuit court, against the Midland Railway Company, for $2,797.71, and also under a deed for a portion of the mortgaged premises acquired by the company for a depot-house or station, with its curtilage, in Paterson, and

which was sold and conveyed to Van Houten and Demarest by the sheriff of the county of Passaic under their judgment and in satisfaction of part of the amount of it. The judgment was recovered upon a mechanics lien claim. The work and materials for which it was recovered were furnished, however, subsequently to the recording of the three mortgages. The lien claimed by virtue thereof is subsequent and subject to the lien of those mortgages, and consequently the title under the sheriff's deed is subject to the mortgages. The lien for the unpaid balance of the judgment is, of course, subsequent to the mortgages as to the real estate, but as to the chattels it is prior. It is urged that the property sold and conveyed by the sheriff was outside of the line of the railway, and was, therefore, not subject to the mortgages; but it was property acquired for the purposes of a station, and was, in fact, adapted and devoted to that purpose by the erection of the building in respect of which the lien was claimed. It was property connected with the main line of the railroad, and is to be regarded as part of the mortgaged premises. *State* v. *Mansfield, 3 Zab. 510.*

Cornelius T. Demarest and others, in behalf of themselves and others who were employes of the railroad company when the decree of insolvency was made, claim preference in payment for the wages due them at that time. The amount is about $61,000. It is alleged to be due to the employes for wages, and to boarding-house keepers for board furnished, at the request of the company, to its employes, during the months of November and December, 1874, and January and February, 1875. It is insisted that, as these wages were earned and the board furnished after the interest upon the complainants' mortgage now in suit was in default, and the complainants, as mortgagees in trust, were entitled, under the provisions of the mortgage, by reason of such default, to take and hold possession of the mortgaged franchises and property and apply the income, in the first place, to the payment of the expenses of oper-

ating the road; therefore, the employes and those who furnished the board are entitled, as against the mortgagees, to the same priority to which they would have been entitled had the trustees taken possession and the services been rendered to them. It is further insisted that the services rendered by the employes were of great value to the mortgagees in maintaining and preserving the mortgaged franchises and property; that the mortgagees and the *cestuis que trust* were aware of the insolvency of the company, while the employes and those who furnished the board were not, and that, therefore, in equity, the wages and the money due for board should be charged upon the mortgaged franchises and property prior to the mortgage debt, and be paid out of the income and profits of the railroad, if sufficient for the purpose, and if not, then out of the proceeds of the sale of the premises. Of the claim, $57,331.45 are for wages. The balance, $638.28, appear to be, not for board, but for orders and loans.

By the act approved February 12th, 1874, " for the relief of citizens on the line of any railroad that has, or may hereafter fail or neglect to operate," it is provided that whenever the chancellor shall appoint a receiver of any railroad, the receiver shall apply all unencumbered personal effects and all moneys which may be transferred to him at the time of entering upon his duties as such receiver, to the payment of wages at that time due the employes of the company, and that the chancellor may from time to time make such orders as he may deem proper to equitably carry out the provision, provided that no such payment shall be made for more than two months' wages. (*Rev. p. 943* § *161.*) By virtue of that act, the employes are entitled to a lien on the unencumbered property of the company, and on its encumbered property subject to existing encumbrances, for the wages, not exceeding wages for two months, due to them when Mr. Hobart entered on his duties as receiver. *Williamson* v. *N. J. Southern R. R. Co., 1 Stew. 277.*

By the act concerning corporations (*Rev. p. 188 § 63*), it is provided that in case of the insolvency of any corporation, all laborers in the employ thereof shall have a lien upon the assets for the amount of wages due to them respectively, which shall be paid prior to any other debts of the company. This act was passed in 1875. The lien which it gives cannot be extended so as to impair the obligation or lien of duly recorded encumbrances antecedent to the act.

The subject of the construction to be given to such an act was considered in *Williamson* v. *N. J. Southern R. R.*, *ubi supra*, in connection with the act of 1874, and it was there held that the lien of employes under that act could not be extended beyond the provisions of the act, which, though it would receive a reasonable construction, could not, of course, be so construed as to diminish or impair the obligations or liens of judgment creditors or mortgagees whose encumbrances existed before the passage of the act. See *Jones on Railroad Securities § 557*.

As before stated, Garret A. Hobart was appointed receiver of the company in insolvency on the 8th of March, 1875, and he and James W. McCulloh were appointed receivers of the mortgaged property in this suit, March 30th, 1875, twenty-two days afterwards. *Prima facie*, at least, the net income which has been received since the latter took possession of the road, is applicable to the payment of the mortgage encumbrances which are prior to the claims of the employes. It does not appear that there will be enough without the income to pay those prior debts.

In a recent case, *Fosdick* v. *Schall*, decided in the United States supreme court, October term, 1878 (8 *Cent. L. J. 298*), it was held that though the income of mortgaged railroad premises in the hands of a receiver, in a suit to foreclose the mortgage, *prima facie* belongs to the mortgagee, yet the court may deal with it according to equity, and apply it to the payment of the unsecured claims for labor, supplies and the like, which, but for the diversion of the funds by the company to the payment of the mortgage,

instead of paying those claims, would have been applied in the ordinary course of business to the satisfaction thereof. The grounds on which the decision rests are the power of the court to do equity, in the imposition of equitable terms, at the time when its aid is invoked by the mortgagee for the realization of the money due him on his security, and an equity found to exist from what is characterized as the diversion of funds in the payment by the mortgagor while in possession, to the mortgagee, of money, net income of the premises, which, in the ordinary course of business and equitably, should have been applied to the payment of the debts for labor, supplies, &c.   In the case before me the claim of the employes is not put on either of those grounds, but on the ground of the equity which, it is insisted, arises from the fact that the mortgagees did not take possession, as they might have done, under the mortgage, of the mortgaged premises, after default, and that they were aware of the insolvency which occasioned the default, while the employes were not.

The claim could not have been successfully put on either of the grounds taken in *Fosdick* v. *Schall*, for no terms of payment of these debts were imposed when the receivers were appointed, and it does not appear that there has been any diversion of funds to the mortgagees, for the default in payment of interest occurred long before the claims for labor accrued, and there has been no payment on account of principal or interest of the mortgages since the debts for labor were contracted.   Said the court in *Fosdick* v. *Schall*: "The power rests upon the fact that, in the administration of the affairs of the company, the mortgage creditors have got possession of that which, in equity, belongs to the whole or a part of the general creditors.   Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that, if there has been in reality no diversion, there can be no restoration, and that the amount of restoration should be made to depend on the amount of the diversion."

It will be seen that this decision is not in accord with that in *Duncan* v. *Trustees of the Chesapeake and Ohio R. R. Co., 9 Amer. Railw. Rep. 386,* where the ground was taken that a railroad company is to be regarded, after default, as mere agents of the mortgagee, so far as the wages of employes are concerned, and on foreclosure the mortgagee will be required to pay out of the earnings, or out of the proceeds of the sale of the premises, the wages of the employes in arrear. Nor is it in accord with the decision in *Douglass* v. *Cline, 12 Bush 608,* where it was held that the right of the mortgagee to have his money raised out of the mortgaged premises as against unsecured creditors, is equitable only, and therefore the court, in granting it, may impose reasonable conditions, either on appointing a receiver, or afterwards.

The claim made on the ground of knowledge on the part of the mortgagees and their *cestuis que trust* of the default in payment of interest, and the power of the former to take possession under the mortgage, and the ignorance of the employes of the existence of the default, is not sustainable. The mortgagees owed to the employes of the mortgagor no duty under the circumstances. They were at liberty to refrain from taking possession if and as they saw fit, and by so doing they incurred no liability to the employes of the mortgagor to indemnify them on the contracts, express or implied, of the latter with them for the payment of their wages. The mortgages were on record, and the record was notice to all. It surely would not be claimed that the holder of a mortgage past due upon a farm is liable, merely because he is mortgagee, for the wages of the hands employed by the mortgagor in working the farm after default; nor that the holder of a mortgage upon a factory is, merely because he is mortgagee, liable for the wages of the workmen who may be employed by the mortgagor in operating the works after default, although it may have been of the greatest importance to the mortgagee's security that the farm, in the one case, should not go untilled, or the factory, in the

other, remain idle.   The doctrine of salvage is an admiralty doctrine, and has not been adopted by this court.

Said the court, in *Galveston R. R.* v. *Cowdrey, 11 Wall. 459, 482:* " As to the other points, giving priority to the last creditor for aiding to conserve the thing, all that is necessary to say is, that the rule referred to has never been introduced into our laws except in maritime cases, which stand on a particular reason."   It is due to the proper administration of justice that the rights of all parties shall be clearly understood and strictly respected, and recourse is not to be had to devices, either by way of refinement in the application of principles or the introduction of new doctrines to effect purposes which, however commendable in their design, result, in operation, in taking the property of one man to pay another's debt, and in creating liens in favor of one class of creditors to override the existing lawful liens of others, which is neither according to law or equity, and is in violation of constitutional rights.   The consequences of creating such liens as that which is insisted on in this case in behalf of the employes, are easily foreseen.   Such liens could not be confined to that class of meritorious creditors, but must be extended to all others with claims equally meritorious, though not for the wages of labor. They must, on principle, be extended to those who have furnished supplies of any kind necessary for the operation of the road, and to all who have lent or advanced money which was necessary to keep it in operation.

The claims of directors of the Midland Company to subrogation to the rights of the vendors of rolling stock are to be considered.   That stock was held by the company under agreements, by which the purchase-money was to be paid in certain installments, and, in default of payment, it was to forfeit all money paid on account of the price and give up possession; the vendors, by the agreement, retaining the title until all the installments should have been paid in full. The claims are made with respect to advances which were made in 1874, by Hezekiah Watkins, Dewitt C. Littlejohn,

Cornelius A. Wortendyke, Henry R. Low, Richard P. Terhune, Samuel E. Olmstead, John N. Gamewell, Garret A. Hobart and Edward T. Bell, all of whom were directors of the company when the advances were made. The company was then insolvent and without credit. The advances were necessary to enable it to make payments on the contracts, and, therefore, to secure to it and to those who might have liens upon the rolling stock or on the road, the benefit of the installments already paid, and, also, to secure to the company and its mortgagees the continued use of the rolling stock, without which the operation of the road must have ceased. The advances amounted to about $20,000. Messrs. Wortendyke, Littlejohn, Watkins, Low and Terhune were guarantors on the contracts. It seems to me quite clear that, for the repayment of the money so advanced, an equitable lien should be established. The claim to such lien cannot be successfully resisted on the ground that the advances were merely voluntary; for it is clearly proved that they were made on the understanding that those by whom they were made should be subrogated, in respect to them, to the rights of the vendors. It is true, this understanding was merely with the members of the board, and was not expressed in such a way as to be legally binding on the company, for the board passed no resolution on the subject; undoubtedly, merely because it was not supposed that any was necessary. The fact that such an understanding did exist and was relied upon as security for the repayment of the money, makes it impossible to treat the advances as merely voluntary or as mere loans to the company on its credit. The proof is that they would not have been made on the credit of the company, nor would they have been made at all, except on that understanding. The fact that the understanding was not put into the shape of a resolution of the board cannot, under the circumstances, change the character of the action of those by whom they were made, nor ought it to deprive them of their equity. It was said in this matter, in *Coe* v. *N. J. Midland Railway Co., 12 C. E.*

*Gr. 110, 113*, that those who made the advances were direct-ors, and, therefore, stood in the relation of trustees, and so were entitled to re-imbursement out of the trust property for the advances made by them to save the property, and that it would be gross injustice to give to the mortgagees or other creditors of the company, under the circumstances, the benefit of the advances at the expense of those by whom they were so made. It is said, however, that this view was not only not concurred in by the court of errors and appeals in its review of that case (*Receivers &c.* v. *Wortendyke, 12 C. E. Gr. 658*), but was repudiated. I do not so understand the opinion. It declares, indeed, that payments by directors to secure the property of the corporation do not of them-selves entitle them to conventional subrogation, which is undoubtedly true. But there is more in this case. There is the fact that the advances were made on the faith of an understanding that those who made them should have an equitable lien for them.

This case appears to me to be entirely within the prin-ciple of *Paine* v. *Hathaway, 3 Vt. 212*, where it was held that if one who had agreed with a debtor to advance the money (to be secured by mortgage on land) to discharge a debt secured by encumbrance on the land, himself pays the debt and discharges the encumbrance, he is entitled to sub-rogation, and cannot be regarded as a volunteer or a stranger with regard to the debt he has paid, but, in equity, is entitled to the benefit of the security which he has satis-fied with the expectation of receiving a new lien on the land therefor. *Dixon on Subrogation 165.* By the civil law, a third person might acquire the right of subrogation by agreement with the debtor that, upon paying the debt for him, he should be substituted in the place of the debtor; the fact that payment was made with the lender's money was, however, to be mentioned in the acquittance. And it was the same thing if the money was handed to the debtor, and paid by him, if he mentioned the fact that it was with the money of the lender that the debt was paid. *Domat* § *1781.*

So that it made no difference whether the money was paid over directly by the lender to the creditor or was paid by the debtor to be paid to the creditor.

The real question in all such cases is, whether the payment made by the stranger was a loan to the debtor through a mere desire to aid him, or whether it was made with the expectation of being substituted in the place of the creditor. If the former, he is not entitled to subrogation; if the latter, he is. By the substitution, no injury is done to any creditor; and it seems quite clear that equity should not permit the just expectation of the lender to be disappointed, where the debtor is a corporation, merely because the agreement for substitution was not put into such a shape as to be legally binding on the borrower. It was the duty of the board, in this case, to pass a resolution, or otherwise evidence the agreement, on the faith of which the money was paid. The company, on the faith of the agreement, received about $20,000 of the private funds of the persons who made the advances, which were of the utmost advantage to the mortgagees, in saving the rolling stock, and none whatever to the lenders. Every dictate of justice demands that the advances be secured by an equitable lien on the property in respect to which they were made. The persons who made these advances were, as has been stated, directors, and not only might, but undoubtedly would, have passed any resolution, or authorized the execution of any instrument, which they had thought necessary for their protection in making the contemplated payments. The fact that they were directors is not without importance otherwise in this connection. They held a fiduciary relation to the company, and, also, under the circumstances, to the mortgagees. At least, they were not strangers. The company had no money with which to save the property in their hands. They would not lend the money to it on its own credit, for it had, as they well knew, no means of repaying it. A guardian who, having no funds of his ward, pays the debt of the latter, would be entitled to subrogation on very

obvious grounds. *Dixon on Subrogation 147*. The same principle is applicable to the case in hand. Nor is there any danger to be apprehended from such a precedent. It is, manifestly, in accordance with the plainest dictates of justice. It will violate no principle. It cannot give countenance to claims for subrogation not founded on right, for the strength of the position is, that the payment was, in fact, made on the faith of subrogation, and on that alone. If the proper resolution had been passed, there would have been no room to question the right to conventional subrogation. Under the circumstances, equity may well supply the lack of the formal resolution.

Again, some of those who made the advances were, as before stated, guarantors, and, therefore, bound for the payment. As to their claim to subrogation, there cannot be any doubt.

Nor will the fact that it cannot be ascertained, from the evidence, what amount was advanced by any one, on any of the contracts, defeat the equity. Mr. Wortendyke says the money advanced was paid on all the contracts. The evidence, indeed, is not sufficiently definite to enable the court to declare the particular lien of any of those who made the advances on any particular property, and it seems doubtful whether it could be made more definite. The money appears to have been paid into the treasury of the company, and to have been paid out therefrom upon the contracts, as if it were the money of the company. But it was advanced and used to make certain payments on all the contracts, and those who made the advances are all together entitled to the credit of those payments, and the contribution of each one to them is proved. Of course, the lien hereby declared can only attach subject to the rights of the vendors. But it is not to be postponed to the payments made by the receivers. They were made for the mortgagees. Nor will the fact that efforts have been made by some of these directors to obtain indemnity out of the assets of the company, deprive them of their right to the

lien; for they have received no actual indemnity, and they may be required to deliver up all that they have received, stock &c., on that account, as a condition of granting the lien.

The mortgage of the Hudson Connecting Railway Company held by E. Ellery Anderson, trustee, given originally to James P. Wallace, trustee, is dated January 1st, 1872, and purports to convey the line of railway then (as the mortgage states) known and to be known as the Hudson Connecting Railway, as the same was being and should be constructed from the Newark and New York Railroad at West Bergen, near Jersey City, northerly to a point in the New Jersey Midland Railway, south of the division line between the counties of Hudson and Bergen, and also to the Montclair Railway at or near Snake Hill, in the county of Hudson, comprising about ten miles of railway connecting the roads of the Newark and New York Railroad Company, the New Jersey Railroad and Transportation Company, the Morris and Essex Railroad Company, the Erie Railway Company, the Northern Railroad Company, and the New Jersey Midland Railway Company, with its road and with each other, including all the railway &c. then held or acquired, or thereafter to be held or acquired, by the Hudson Connecting Railway Company, its successors or assigns, for use in connection with its railway, and all its franchises and appurtenances &c. It was made to secure bonds of the Hudson Connecting Railway Company, amounting in all to $400,000, called first mortgage bonds, and passing by delivery or transfer on the books of the company. The trustee representing the holders of the bonds secured by this mortgage, insists that the mortgage is a good and valid encumbrance upon all the property mentioned and described therein; while, on the other hand, the holders of the encumbrances on the New Jersey Midland Railway insist that the mortgage is not valid, because, as they allege, the mortgaged railroads therein described, excepting so much as extends from the Newark and New York Railroad to

West End, and from the Midland Railway to the Montclair Railway at Snake Hill, were built, and the land or right of way purchased with, the money of and by the Midland Railway Company.

The Hudson Connecting Railway Company was incorporated by act of the legislature, approved April 1st, 1869 (*P. L. 1869, p. 1063*). By its charter, its incorporators were authorized and invested with all the rights and powers necessary to construct one or more railways in the county of Hudson, to connect the several railways therein; and the company was authorized to make its bonds, and, for the purpose of securing their payment, to mortgage its real estate and personal property, the railway or railways, and all the appurtenances, franchises, powers, privileges and rights belonging thereto which it might possess under its charter, to such an amount as it might deem for its best interest, without the invalidation thereof by virtue of any statute· of this state. And it was provided that the bonds and mortgages so sold or negotiated should be valid and binding in law and equity, and that the purchaser or purchasers under decree of foreclosure founded upon the mortgage, should be invested with all the authority, rights, franchises, powers and privileges which were, by the act, or might thereafter be, conferred upon or possessed by the company under its charter, and to all the assets and rights which might be acquired by the company, either by condemnation as by the act provided, or by contract or purchase, or other mode of acquisition consistent with the charter.

The company was organized on the 17th of May, 1869. By resolution, passed on that day, Delos E. Culver was directed to cause surveys to be made, to be presented to the board of directors, for the construction of the railway from the Newark and New York Railroad along the westerly slope of Bergen Hill, northerly, to connect all the steam railroads together; and on the 9th of May, 1871, about two years afterwards, the location, maps and plans of the portion of the railway which it was then proposed to build,

were laid before the board, and it was then resolved and ordered that the location and maps be filed, according to law, from the Newark and New York Railroad northerly to some point on the New Jersey Midland Railroad, northerly to the county road (so called because it leads to the county house on Snake Hill), and also of a railway to connect with the New Jersey Railroad from the main line, and also one to connect with the Montclair Railway. The location and survey of the portion of the Hudson Connecting Railway, from the Newark and New York Railroad to the road of the Northern Railroad of New Jersey, made in pursuance of this resolution, was filed on the 29th of June, 1871. Another location was filed November, 1871, extending from the Pennsylvania Railroad (the New Jersey Railroad and Transportation Company's railroad) to the county road north of the crossing of the Erie Railway Company. On the 28th of March, 1872, a further location and survey were filed, to cover the route of the road from the Midland Railway at Van Keuren avenue, and running thence northwesterly to the main line of the Montclair Railway; and in 1874 it filed another location and survey of the part of the road between the Secaucus and county roads.

The New Jersey Midland Railway Company, up to the spring of 1871, intended to reach the Hudson river by a direct route, but having then discovered that the expense of any such route, by reason of the obstruction presented by Bergen Hill, would be so great as to render it impracticable, it thereupon sought to make a connection of its road with that of the Pennsylvania Railroad Company, and thus reach the river over the latter road. With that view, it filed, on the 12th of July, 1871, a location of a branch line (as it is called in the survey) of its road from a point therein near Bellman's Creek, to the Pennsylvania Railroad at West End. This location is from the latter place to a point in the land of Van Keuren, identical with the survey and location of the Hudson Connecting Company, of June 29th, 1871, between those points, and part of it (*i. e.* from West

End to the county road) is identical with the survey of the latter company of November, 1871. In the spring of 1871, the Midland Company set about acquiring the title to land for its road to West End, and in that spring and the following summer acquired much of the land which was required. It found some difficulty, arising from want of power, as it was adjudged, in acquiring the title to lands of certain corporations, by condemnation. Inasmuch as it was necessary to acquire this land, its management had recourse to the charter of the Connecting Company for the purpose, and condemnation proceedings were accordingly taken in the name of the latter company in the winter of 1871–2 and spring of 1872. The land which was acquired, whether by condemnation or otherwise, for the road, was paid for by the Midland Company. On the other hand, of the Hudson Connecting Company's bonds, secured by the mortgage before mentioned, there were, about the 1st of May, 1872, received by the management of the Midland Company, $166,000, reckoning the bonds at their par value. The bonds so received by the Midland Company were used for its benefit. It pledged them to the Chemung Canal Bank as security for a loan of $100,000. The loan was subsequently paid—partly by the proceeds of the sale of the bonds, which were sold by the bank at eight cents on the dollar, or thereabouts. The money received from the bank (the $100,000) was applied, part to the payment of interest on the first mortgage bonds of the Midland Company, and the rest used in its business generally. It does not appear clearly what was done with the rest of the Connecting Company's bonds, except that $84,000, par value, went to the Montclair Company; but it would seem that they were in some way used by the New York and Oswego Midland Company, or its president, for the benefit of the New Jersey Midland and Montclair Companies.

The question between the mortgagees of the Midland Company and those of the Connecting Company is, as to the part of the road operated by the former from the county

road to West End. On the one hand, the former insist that recourse was had to the charter of the Connecting Company, merely to bridge over a difficulty, and as a means of acquiring title to land for the Midland Company, which it could not otherwise obtain without considerable and injurious delay in litigation to vindicate its right, or in obtaining further legislation, and that, inasmuch as the money to pay for the land so taken by condemnation was paid by the Midland Company, a trust resulted to it in the land in the hands of the Connecting Company. They also insist, and it appears, that the title to the greater part of the land on which the railroad was built, was taken in the name of the Midland Company, and, as before stated, the money to build the road was furnished by it. They further insist that the Connecting Company had no existence except to enable the Midland Company to obtain title under the charter of the former, and that its organization was merely for that purpose and to that end, and when that purpose and end had been accomplished, its organization practically ceased; and that the Midland Company having thus obtained, through the use of the Connecting Company, land which it needed and could not otherwise acquire, is entitled to hold it under the circumstances, as against the bondholders of the Connecting Company. On the other hand, the bondholders of the latter company insist that it had a lawful and valid organization and existence; that the right of location over the route on which the road was built was granted to it by the Midland Company, and that it located the road accordingly, and made its contract for the building of the road in its own name, paid for it in its stock, part of which went to the Midland Company, and the rest to the Montclair Company; that the money requisite to pay the contractor was thus raised, and that a part of the land covered by the Connecting Company mortgage (all of the land on which the road in dispute is) was, after the Connecting Company's mortgage was given, conveyed by the Midland Company to the former company, the Midland Company taking in return

the still subsisting lease of it. They also insist that the complainants' mortgage does not cover the road in dispute, because the Midland Company had no power to build it, and, if it had, it did not contemplate building it when the mortgage was given.

Although the Midland Company undoubtedly intended and expected, when its mortgages were made, to reach the Hudson river by a direct route, and did not contemplate being compelled to reach it by means of the connection at West End with the Pennsylvania Railroad; and though the mortgage to the complainants describes the road as a line of railroad known and to be known as the New Jersey Midland Railway, as the same was then being, and should be, constructed, from the state line at or near Unionville, in the state of New York, to the Hudson river, the mortgage also covers, by its terms, all real or personal property then held or acquired, or thereafter to be held or acquired, by the company, its successors or assigns, for use in connection with that railway, or with any part thereof, or with the business thereof, and all the franchises of the corporation. The covenant, for further assurance, provides for the conveyance of any property acquired by the company subsequently to the date of the mortgage, and comprehended in the description contained in the mortgage, if any such there should be which should not inure to the use and benefit of the holders of the bonds under the terms and covenants of the mortgage.

The location of the New Jersey, Hudson and Delaware Railroad Company, made before consolidation, struck the Hudson river at the Weehawken ferry; and it was intended by that location to pass through the hill, and so reach the river. After the consolidation, and when the construction of the road had commenced, and for a year afterwards, the route of the Midland Company was, according to the map and location, filed September, 1870, at the east end, as follows: from Bellman's creek, going up the side of the hill; then down King's ravine, and then entering Hoboken and

reaching the river in the cove south of the Delaware and Hudson coal dock, two miles north of the Long Dock tunnel. But the fact that the road in question was not contemplated by the mortgagor when the mortgage was made, is not enough of itself to exclude it from the lien of that instrument. If the building of it was within the mortgaged franchises, and it was not excluded by the terms of the mortgage, it would be embraced in it.

In *Randolph* v. *N. J. West Line R. R., 1 Stew. 49,* a railroad company mortgaged its railroad, describing it as all and singular the railroad of the New Jersey West Line Railroad Company, and the appurtenances thereto belonging, acquired and to be acquired, constructed and to be constructed through and along the entire main line of the company's railroad, from the eastern terminus of the railroad, at the city of Newark, westerly across the state of New Jersey to the westward terminus of the railroad at the Pennsylvania state line, including in the description all the property, franchises, rights and things of whatsoever name or nature then held, or which should be thereafter held or acquired, by the company or their successors or assigns, pertaining to the said main line of the railroad, or the equipment thereof; together with the tenements, hereditaments and appurtenances to the said main line of railroad, lands and premises, or either thereof, belonging &c. By a subsequent act of the legislature, authority was given to the company to extend the road from Newark eastward to the Hudson river. It was held that it did not appear that the extension was contemplated when the mortgage was made, and that it was no part of the main line as described in that mortgage; that the franchise granted by the subsequent act was not acquired for use as part of the main line, nor did it pertain thereto; that it was indeed acquired for use in connection with the main line, but it was to build another road, and that it was not within the terms of the mortgage or its covenants, and therefore was not covered by the mortgage.

Coe *v.* N. J. Midland Railway Co.

In that case, it will be perceived, it was expressly the main line of the railroad which was mortgaged, and its termini were given, beginning at Newark and ending at the Pennsylvania state line. The act by which the extension was authorized was not in existence when the mortgage was made, and, so far as appeared, was not in contemplation. It was clear that the extension should be treated as a road not within the terms of the mortgage or within the contemplation of the parties to that instrument. The company had no power to build the extension when the mortgage was given, and the extension could not, therefore, be held to have been in contemplation. In this case, however, it appears that the original design to reach the Hudson river, by a very direct route, was abandoned by reason of its impracticability on account of its expensiveness, and thereupon the company sought to reach the river by the best means available to it, by what it called a branch road and the Pennsylvania Railroad. The Midland Company had power, under its charter, to build the road to West End. Though, under the charter of the New Jersey, Hudson and Delaware Company, it had not the power to build south of the turnpike (*i. e.* it lacked the power to make an actual connection with the Pennsylvania Railroad), that connection could have been effected by the consent of the Pennsylvania Company. But, under the charter of the Western Company, it had ample power to connect with any other railroad or railroads in the county of Hudson (*P. L. 1870, p. 580*). Nor would the fact that the Midland Company's charter power was not, if such had been the case, sufficient to enable it to condemn some, or even all, of the land requisite to build the road, defeat the right to build, for the right to the land might have been acquired by purchase. The road from Bellman's creek to West End was built under the charter of the Midland Company. From Bellman's creek to the county road it was built on the location of the Midland Company. The Connecting Company has never made any location of that part of the route from Bellman's creek

towards West End which is between the creek and the middle of the Secaucus road.   As to another part, from the Secaucus road southwardly to the county road, the Connecting Company had no location until April 9th, 1874, long after the road had been completed, and more than two years after the making of the Connecting Company's mortgage.   For the part from the county road southwardly to a point in the lands of Van Keuren, which point was the termination of a survey and location filed by the Connecting Company, June 29th, 1871, by which it located its road from the Newark and New York Railroad to the railroad of the Northern Railroad Company, it had no location until November 8th, 1871, and the location which it filed at that date was made for its whole length, on a location previously made by the Midland Company and duly filed July 12th, 1871.   The last-mentioned location and survey gave the Midland Company the right of location (*Morris & Essex R. R. Co.* v. *Blair, 1 Stock. 635*).   Although the filing of the location of November, 1871, by the Connecting Company, was through the instrumentality of the officers of the Midland Company, or some of them, the hand of that corporation, as such, does not appear in it.   It was done merely as a means to an end, and the end to be accomplished was the condemnation of property for the Midland Company under the Connecting Company's charter.   That such only were the object and purpose of that location is evidenced by the fact before suggested, that there was no relinquishment by the Midland Company, as such, and the fact that in a survey and location filed in March, 1872, by the Connecting Company, of a road called the Montclair Branch, the beginning point is stated to be a point in the New Jersey Midland Railway, thus designating the road in question as the road of the Midland Company more than four months after the location and survey of November, 1871, had been filed.   It should be added, that the entire evidence shows conclusively that the location and survey of November, 1871, were filed merely with a view to the proceedings in condemnation

which it was proposed to take in the name of the Connect-
ing Company for the benefit of the Midland Company, and
which could not have been taken without filing the location
and survey in the name of the Connecting Company.   As
to the rest of the road to West End, though the Connecting ·
Company filed a location in June, 1871, it did not build
upon it, but, with full knowledge, permitted the Midland
Company, in July following, to take the location as its own
and build its road upon it.   It appears to have no title,
except under the deed of 1873, to any of the land on which
that part of the road is built, but the Midland Company
bought and paid for, and took title to, all of it.   Not only
was the road in question built on the location of the Mid-
land Company, but it was built by and with the money of
that company.   Henry R. Low, treasurer of the Midland
Company, testifies that the Midland Company paid, for the
right of way, about $100,000; for construction, about
$150,000, and subsequently some $50,000 more—about
$300,000 in all.   The road thus built on the location of the
Midland Company, under its charter and with its money,
must be regarded as its property.   As to any land taken by
condemnation under the charter of the Connecting Com-
pany and paid for with money of that company, it must be
regarded in the same light as that of a land owner would
which has been taken for a railroad, and of which, by per-
mission, the company is in possession, but which has not
been paid for.   *Morris & Essex R. R. Co.* v. *Blair, ubi supra.*

It is entirely undeniable that, but for the difficulty which
was encountered by the Midland Company in condemning
certain land necessary for the construction of the road, the
road would have been built without any action whatever on
the part of the Connecting Company, or any aid from it.   It
is equally undeniable that the Midland Company never
resigned the enterprise to the Connecting Company, but, on
the contrary, it was at all times regarded as the road of the
Midland Company, and the condemnations of land made
under the charter of the Connecting Company were made

for the Midland Company. The Connecting Company merely lent its charter powers of condemnation to the latter to be used if and when necessary to effectuate the purpose of the latter, in the execution of which it then was, and for a considerable length of time had been, engaged—the construction of its railroad from Bellman's creek to West End. That was the end and aim of the project of using the Connecting Company's charter, and the sum and substance of the whole matter.

It is true the Connecting Company appears to have made two agreements in regard to the railroad in question in this suit, one in April, 1872, and the other in October following. Both were made with the Delaware, Lackawanna and Western, and Morris and Essex Railroad Companies. The first of these provided a crossing for the road in dispute over the old Morris and Essex Railroad, and the other provided a crossing for the Montclair Branch over that road. By the latter, the Connecting Company agreed with the other parties to the agreement, in consideration of those rights of crossing, to give them the right of crossing for their roads (the Morris and Essex and Boonton Branch) over the road in dispute. As to the first agreement, which is in reference to the road in dispute, it was made at the time when (for the purpose, and only for the purpose, of condemning land for the Midland Company) that company was using the charter power of the Connecting Company. The circumstance that the agreements were made in the name of the latter company, cannot countervail the evidence that the road in dispute was, in fact, not its property, but the property of the Midland Company.

The fact that the Midland Company gave to the Connecting Company, in 1873, a deed of conveyance for that part of the road which was covered by the mortgage given by the latter, taking in return, in July, 1874, a lease from the Connecting Company for it, of course will not affect the rights of the complainants and the other mortgagees of the Midland Company. The Midland Company could not, by

the conveyance, divest or affect the prior rights of its prior mortgagees. Nor will the fact that the Midland Company obtained money on the bonds of the Connecting Company (Judge Low says it obtained about $100,000 thereon), avail to give the Connecting Company a lien upon the road in question. If the money received by the Midland Company from the Connecting Company was used to pay interest on the mortgages of the Midland Company, that will not give a lien for it. If it went to supply the place in the treasury of money paid for land for, and for the construction of, the road in dispute, that fact will not of itself, of course, give any lien. If used to pay the purchase-money of land bought by the Midland Company for the road the title whereto was taken by the latter, the fact that it was so used will give no lien.

Those who took the bonds of the Connecting Company, had constructive notice of the fact that the Midland Company had a prior location as to all the road except the part included in the location of June, 1871, and, as to that, that it was building its road upon it. Inquiry would have apprised them of the fact that the Connecting Company had abandoned that location in favor of the Midland Company. They had constructive notice that the title to by far the greater part of the land for the road was held by the Midland Company, and not by the Connecting Company, and that the mortgages of the Midland Company in general terms covered the road. The Midland Company not only built the road, but remained in possession, afterwards acknowledging no title of the Connecting Company, until October 16th, 1873, when the deed of conveyance was given.

The Connecting Company's mortgage appears to have been used by the management of the New Jersey Midland, the Montclair and New York, and Oswego Midland Companies as a means of raising money. To give the bonds credit they were guaranteed by all three of the companies.

When sold they sold at a very low price, from the fact that they were a doubtful security.

Since this suit was begun, parts of the land purchased by the Midland Company for the road from Bellman's creek to West End, have been sold under foreclosure of mortgages thereon, and, by direction of this court, the property has been bought in by the receivers. The amount paid by them therefor is about $30,000. The fact that the title has been thus changed would not affect the rights of the parties litigant in the controversy between the mortgagees of the Midland Company and the mortgagee of the Connecting Company, but the court would order a conveyance of the property to the party entitled to it, on proper terms.

In the year 1872, and prior thereto, the Delaware, Lackawanna and Western Railroad Company, as lessee of the Morris and Essex Railroad Company, ran its trains through Hudson county on what is now the old line of the Morris and Essex Railroad, passing thence through the Erie tunnel and under the Midland road at a point south of the Long Dock Company's land. It then contemplated the construction of a tunnel of its own through Bergen Hill, and had made surveys for that purpose, and had projected a route to reach the tunnel. This route would cross the road occupied by the Midland Company at a point south of the Erie crossing. In April, 1872, an agreement was made, in the name of the Connecting Company, with the Delaware, Lackawanna and Western, and Morris and Essex Companies, that the Midland road should be permitted to cross the Morris and Essex road, and the crossing was made accordingly. Subsequently, the Montclair Company and the Connecting Company, having constructed a road from the road of the Midland Company to Penhorn creek, wished to cross the then existing line of the Morris and Essex Railroad Company.

An agreement was made between the Connecting Company of the one part, and the Delaware, Lackawanna and Western, and the Morris and Essex Companies of the other,

dated October 16th, 1872, by which the Connecting Company, in consideration of the grant of the before-mentioned right to cross the Morris and Essex Railroad and the right to cross with the Montclair Branch, agreed to allow the Delaware, Lackawanna and Western Company to cross its line. It appears that, subsequently, the Delaware, Lackawanna and Western Company changed the position of its new tunnel and the line to reach it, so as to cross the railroad operated by the Midland Company, at two points, both being south of the old crossing of the Morris and Essex Railroad. When the Delaware, Lackawanna and Western Company had completed its tunnel, or nearly so, it was about to cross the road operated by the receivers of the Midland Company, and an injunction was obtained in the premises by the receivers, and orders were afterwards made by this court requiring the Delaware, Lackawanna and Western Company to raise the grade of the road in the possession of the receivers, at a point where the new crossings were to be made, and to make all other changes which would be necessary in consequence of the change of the grade on account of the crossing, which was not at grade. At the place where these crossings were made, the receivers had in possession and were occupying, as part of the railroad property, a piece of land about 1,800 feet long, for terminal purposes and as a drill-yard.

The order before mentioned recited that the chancellor was of the opinion that the order which had been made upon the petition of the receivers requiring the Delaware, Lackawanna and Western Company to refrain, until further order, from entering upon, interfering with or raising the tracks or grades mentioned in the petition, or otherwise trespassing upon the railroad tracks, yards or other property then in the possession of the receivers, should not be wholly discharged, and that it would not be just to that company to give judgment at that time upon the rights set forth in its answer to the petition, and that, before that was done, the company should be made a party to this suit and have the

opportunity to litigate therein its rights to the crossing claimed in its answer to the petition, and whether they are subject and subordinate to the complainants' mortgage, and that, pending the proceedings to settle that question, that company should not be hindered or delayed in making or using the crossing, provided it should give sufficient security to pay such damages, including the value of the land taken, to be thereafter ascertained by this court, as might be sustained by the taking and occupation of the land with the proposed tracks and the proposed alterations, to be made as ordered by the court; and it was thereupon ordered that that company and its lessor be, and they were thereby, made parties to this suit, and that the complainants' bill be amended for that purpose, and that the two new defendants answer it and file a cross-bill, if they should elect so to do. And, in the meantime, and until further ordered, the order, except as modified, was to continue in force.

And it was thereupon further ordered and directed that the Delaware, Lackawanna and Western and the Morris and Essex Companies (on filing with the clerk of this court a bond to the chancellor in the sum of $150,000, with condition that they, or one of them, should and would, pursuant to the order of this court in that behalf to be made, pay to the complainants or the receivers, whichever the court should order, such sum or sums of money, if any, as the court should name, order, and direct as the value of the land included in the mortgage of the complainants which should be taken by the two companies last named, or either of them, for the construction and maintenance of the two crossings, and as the amount of any damages which the owners of the railroad described in and mortgaged by the complainants' mortgage would sustain by reason of the taking and use of the lands for the crossings, the value of the lands, and the amount of damage, including any impairment of the yard, if any, to be ascertained by this court; and, also, that the two companies last named, or one of

them, should and would obey, perform and fulfill such order or orders as the chancellor should, from time to time, make as to the raising the grade of the railroad in the possession of the receivers, so as to make the grade thereof properly conform to the grade of the crossings) might, at their own expense, proceed to put in, and, when put in, to use, the two crossings, and to raise the grade of the railroad in the possession of the receivers on each side of each of the crossings, and the appurtenant tracks, if necessary, belonging to the plant; that is, from the southerly side or edge of the bridge from the old main line of the Morris and Essex Railroad to a point southerly of the designated point of said crossings; but, while putting in the crossing and raising the grade, the Delaware, Lackawanna and Western Company, and its lessor, and those acting under them, or either of them, should not interrupt, obstruct, delay, or inconvenience the business carried on on the railroad in the possession of the receivers, more than reasonably necessary in order to put in the crossings and raise the grade; and to the end that the grade might be raised with the least interruption, obstruction, delay and inconvenience practicable, it was provided that the Delaware, Lackawanna and Western Company and its lessor might, at their own expense, employ the receivers, or one of them, to do the work of raising the grade, and that the receivers, or either of them, might be employed for that purpose; they or he, so employed, rendering to this court, whenever required so to do, full and true accounts of all money or other valuable thing by them or him received and disbursed for or on account of or by reason of the work.

The order also provided that the court would, as soon as practicable, ascertain and direct what other and further raising of the grade of the railroad in the possession of the receivers should be done, by or at the expense of the Delaware, Lackawanna and Western Company or its lessor, and that, thereupon, those companies, or one of them, should forthwith, at its or their own expense, proceed with and

promptly complete such other and further raising of the grade as should be ordered; and, until the court should make such order as it should deem proper, as to other and further raising of the grade, the Delaware, Lackawanna and Western Company and its lessor should not use the crossings, or either of them, except the most southerly one, which they might use for construction purposes, as theretofore, under reasonable arrangements with the receivers; and, upon failure to do so, the condition of the bond should be broken, and the Delaware, Lackawanna and Western Company and its lessor, and each of them, and each of their successors and assigns, should thereupon be absolutely enjoined from using the crossings until such other and further raising of the grade should be completed, according to the order of this court; and all other matters, including the question as to the mode of the use of the crossings, and right of precedence of trains, were reserved for further consideration and determination. And it was declared that nothing in that order contained should be construed as taking the property, or any part thereof, out of the possession of this court.

By a subsequent order, made on the 25th of April, 1877, it was further recited that it appeared to the chancellor, by a report of the receivers, that they and the Delaware, Lackawanna and Western Company and its lessor had (subject to the approval and confirmation of the chancellor) agreed upon the other and further raising of the grade of the railroad in the possession of the receivers, which should be done by or at the expense of the Delaware, Lackawanna and Western Company and its lessor, and had also agreed upon what they regarded as a reasonable and sufficient provision for the transaction of the business to be done on that part of the road in the possession of the receivers, affected by the two crossings, and it was ordered that the provision for the further raising of the grade of the railroad in possession of the receivers was sufficient and all that need, in that behalf, be required of the Delaware, Lackawanna

and Western and Morris and Essex Railroad Companies, and that the work should be forthwith completed, and that the receivers might be employed to do it, and thereupon rules and regulations were established for the running of the trains.

By the agreement of October, 1872, already referred to, between the Connecting Company and the Delaware, Lackawanna and Western Company and its lessor, the right was granted to the Connecting Company to construct, over the Morris and Essex Railroad, a railroad bridge (for the Montclair road) of a certain description, to carry its road over the Morris and Essex road; and, in consideration thereof, it was agreed between the parties that, if the Delaware, Lackawanna and Western Company, or its lessor, should desire to change the line and grade of the main line of the Morris and Essex road, or of the Boonton Branch, or of both, so as to make it necessary to cross the railway of the Connecting Company, which, under that agreement, was to be constructed over the Morris and Essex road, or the railway which, under the agreement of April 3d, 1872, had been constructed by that company over the Morris and Essex road, or over both of those railways, the Delaware, Lackawanna and Western Company and its lessor, or either of them, should have the right, without charge, to cross either or both of those railways of the Connecting Company over, under or at grade, and might occupy and use, without charge, so much of the lands of the Connecting Company as might be necessary for that purpose. And if, in making such crossing or crossings, it should be necessary, in order to meet the reasonable requirements of the Delaware, Lackawanna and Western Company and its lessor, or either of them, to modify, change or alter the grades and elevations of the railways of the Connecting Company, or either of them, and the parties could not agree upon such modification, change or alteration, then it was to be referred to the chief engineer (for the time being) of the Philadelphia and Reading Railroad Company, to

decide and determine, upon a consideration of the facts and circumstances, what modification, change or alteration should be made by the Connecting Company in the grades and elevations of its railways in order to meet the requirements of the other companies; and it was thereby declared to be understood to be the intention and purpose of the last-mentioned companies to change the lines and grades of the main lines of the Morris and Essex and Boonton Branch Railroads, with a view to passing through Bergen Hill otherwise than by way of the then existing Bergen tunnel, and that, in thus changing the lines and grades of the Morris and Essex and Boonton Branch Railroads, they intended to cross over the Erie Railway by a bridge of the proper height, and that it was in view of those intentions and purposes that that agreement in reference to the crossing of the railways of the Connecting Company, and in reference to the changing of the grades and elevations thereof, was made; and that, in case of a reference, by way of arbitration, the fact that such intention and purpose were then understood and agreed to exist was to be taken into consideration by the arbitrator or referee, and that his decision should be final and conclusive. And it was provided that all the covenants and agreements contained in the instrument should inure to the benefit of, and be binding on, the successors and assigns of the parties respectively.

The land of the yard was the property of the Midland Company previously to the making of the deed of 1873, and the legal title was in that company.

After what has been said, it need not be remarked that the agreement is not binding on the mortgagees of the Midland Company, except so far as the grant of an equivalent for the grant of a crossing for the Midland road is concerned. To that extent they should be bound by it in equity, or, if not, should be required to return the consideration received by the Midland Company, or an equivalent therefor.

At this point it will be convenient to dispose of certain questions which were raised on the hearing in connection with this agreement. Almost all of them, however, in view of the conclusion which I have reached in regard to the lien of the Connecting Company mortgage, have ceased to have any importance in the decision of this cause.

One of the questions was whether the Connecting Company's mortgage was properly proved, inasmuch as the proof was not made by the subscribing witness. The act respecting conveyances (*Rev. p. 153 § 4*) provides that a deed or conveyance of lands shall be acknowledged or proved according to law, to entitle it to be recorded, and mortgages are to be acknowledged or proved in like manner (*Rev. p. 706 § 20*). Proof is to be made by one or more of the subscribing witnesses. The Connecting Company's mortgage was executed under the common seal and signed by Julius H. Pratt, president, and Henry R. Low, treasurer. The subscribing witness was Theodore R. Shear. The proof was made on the 23d of February, 1872, by Josiah T. Wilcox, then secretary of the company, as to the execution by the company, and on the same day proof was made of the execution by the trustee (James P. Wallace), by Mr. Shear.

The proof of the execution by the company not having been made by the subscribing witness, is not in accordance with the provisions of the law, and did not authorize the recording of the instrument. It is urged, however, that, inasmuch as Mr. Wilcox signed, with Mr. Shear, the certificate of proof which was sworn to by them, and which is attached to the mortgage, and follows it, and refers to that instrument as the "foregoing instrument," the signature thus subscribed to the certificate may be regarded as the signature of the subscribing witness. But Mr. Wilcox was not a subscribing witness to the instrument, and, to comply with the provisions of the statute, the proof should and could only have been made by either Mr. Shear, Mr. Pratt or Mr. Low. To hold that the signature of Mr. Wilcox, under the

circumstances, is that of a subscribing witness, when, in fact, it was not subscribed to the instrument at all, would be to annul the provision of the statute by a construction which would absolutely ignore its plain requirements. It should be remarked that the certificate (which appears upon the mortgage, signed by Josiah T. Wilcox, and certifying that the instrument was sealed and delivered by the Connecting Company and signed by Julius H. Pratt, their president, and Henry R. Low, their treasurer, in his presence) was not placed upon the instrument until the year 1877.

On the 18th of January, in the last-mentioned year, a new proof by him was added to the instrument. The further question was raised, whether it should not appear by the proof that the grantor was made acquainted with the contents of the instrument. This subject has been considered in a former part of this opinion. It may be added to what was before said, that where the subscribing witnesses are dead, of unsound mind, or resident without the United States, proof may be made, under the sixth section of the act, before the circuit court of the county in which the lands, or some part of them, are situated, by proving the handwriting of the witnesses to the full satisfaction of the court. From this it is manifest that the legislature did not intend to require proof that the contents were made known to the grantor.

Another question raised is, whether the mortgagees of the Midland Company are not bound by the agreement through acquiescence. It is insisted that all parties making opposition to the claims of the Delaware, Lackawanna and Western Company, under the agreement, must be silenced by the evidence of acquiescence, in view of the fact that its tunnel was constructed before the eyes of the public, at an expenditure of more than $1,000,000, and it must have been manifest that it was its design, in so locating the tunnel, to conduct its tracks into it across the Midland road; and, further, that in equity the latter company cannot be permitted to withhold the privileges granted by the agreement

without returning the compensation which was the grant of the crossing for its road over the old Morris and Essex road. That the tunnel was constructed before the eyes of the public, was no notice whatever that the company claimed the right to cross the tracks of the Midland Railroad without making compensation. There was nothing inconsistent with the idea of compensation in the construction of the tunnel. The fact that a railroad has been constructed, at whatever expense and with whatever difficulty, up to the line of my land, while it may be evidence to me that the company intends to take my land for the purposes of its road, would surely not estop me from demanding and insisting upon compensation. There is no estoppel by acquiescence in this case.

But if the agreement were valid against the mortgagees of the Midland Company, it would not be so to the extent claimed by the Delaware, Lackawanna and Western Company. At most, it contemplated, according to its terms, the right to cross, without charge, either or both of the railways therein referred to as the railways of the Connecting Company, over, under and at grade, and to use and occupy, without charge; so much of the lands of that company as might be necessary for that purpose. It was an exchange of rights to cross, presumably similar and mutually compensatory, each the equivalent of the other, or nearly so. But, whether so or not, it cannot be doubted that the Connecting Company did not contemplate, in the grant, the consequences which will necessarily follow the construction put upon the instrument by the other party to the agreement. It was a crossing of the railroads that was contemplated, and only that. The occupation of the drilling-yard, and the partial destruction of its value and usefulness, and the very great injury done by that crossing, were certainly not within the contemplation of that company; nor (it may be safely assumed) within that of the other companies.

It is in evidence that the Delaware, Lackawanna and Western Company, early in the year 1872, had, as before

stated, projected a route to reach its new tunnel, which would have crossed the Midland Company's road at a point a little south of the Erie crossing, and a considerable distance away from the drill-yard, and where it would not have materially interfered with the operation of the road, or have done any more damage than would have been compensated for, or nearly so, by the crossing granted to it. If the Delaware, Lackawanna and Western Company had come into this court for specific performance of the agreement (and that is, practically, its attitude before the court now, under the proceedings), it would have rested in the discretion of the court to have decreed specific performance, or not, according as equity demanded, and it would not have been considered in accordance with equity to decree a specific performance of a contract so unequal and unconscionable. This court would not have consented to be the means of inflicting, without adequate compensation, upon the resisting defendant the very great injury which the crossing which has been made has inflicted upon it. The fact that the Delaware, Lackawanna and Western Company and its lessors gave no consideration whatever, except the rights to cross, before mentioned, could not be left out of sight. Under the circumstances, in view of the great private and public injury which would have been occasioned by the refusal of the court to permit the Delaware, Lackawanna and Western Company to connect its road on the west with the tunnel, it was deemed proper to permit it to make the crossing on such terms as it appeared to the court would secure the rights of all for and until a proper and due adjudication thereon. In my judgment, that company should pay such damages, to be ascertained by this court, as will compensate for the injury done, over and above the mere right of crossing, without pay, the railroad of the Midland Company, if such crossing had been made at a place where it could have been made without injury to the yard, or the use thereof, or other injury than the mere crossing by one railroad of the tracks of another.

Coe *v.* N. J. Midland Railway Co.

Francis B. Wallace has been made a party to this suit with respect to his claim for compensation for land in the county of Sussex, sold by him to the Midland Railway Company and occupied by it with its railway. It appears that, on the 1st of July, 1870, he agreed to sell to the company, for its road, the land before referred to, with all the timber thereon, for the sum of $2,572.73, but reserving to himself all the minerals on the property. The company agreed, as part of the consideration, to fence the land and keep the fence in repair. It took possession of the land and laid down its track upon it, and it has been used by it or the receivers ever since, the track being part of the main road. In October, 1874, the price being still unpaid, he demanded a settlement of the company, and it was then agreed between them that he would accept the company's promissory notes running through a period of fifteen months, for the price, with the understanding that, if the notes were paid at maturity, he would convey the land to the company, but, otherwise, he was at liberty to have recourse to legal remedies for the recovery of his property. The notes were never given, nor was the agreement signed, and the matter still rested in verbal understanding up to the time when the company became insolvent. Since the decree of insolvency, the road, including the property in question, has been in the possession of the receivers. The company has never obtained title to the land, and has never paid him the consideration money agreed to be paid, or any part of it. He has never received any security. He is entitled to his lien for the purchase-money.

It results from the foregoing opinion that, in the original suit, there will be a decree that the complainants are entitled to the relief which they seek by their bill, the foreclosure and sale of the mortgaged premises. Their mortgage will be decreed to be the first lien upon the premises, and to include the railroad from Bellman's creek to West End, and all the land purchased for use therewith, subject, however, to the payment of the money due, if anything, to the

11

Hudson Connecting Railway Company, for the cost (with interest) of land condemned or otherwise acquired by that company for the road, the title whereto was taken by it, and for which it has paid and has not been re-imbursed.

That the complainants' mortgage conveys all the estate which the mortgagors had in the mortgaged premises when the mortgage was made, or at any time afterwards.

That the chattel mortgage of Terhune and Olmstead is not a lien upon the property therein mentioned.

That the judgments of the answering judgment creditors on which execution was issued, are entitled to priority in payment out of the mortgaged chattels on which levy might have been made, over the complainants' and the second and third mortgages.

That the plaintiffs in the Hennion judgment are entitled to a vendor's lien on the land for the value whereof their judgment was recovered.

That Francis B. Wallace is entitled to a vendor's lien on his land taken by the Midland Company.

That the relief which the employes seek cannot be accorded.

That the directors by whom advances were made in respect to the rolling stock, and for which advances they claim subrogation, are entitled to an equitable lien on the rolling stock for the advances, subject, of course, to the money due and to become due to the vendors of the stock.

That the Delaware, Lackawanna and Western, and Morris and Essex Railroad Companies are not, as against the encumbrancers of the Midland Company, entitled to specific performance of the agreement of October, 1872, made by the Hudson Connecting Railway Company with them, but will be required to pay to the mortgagees of the Midland Company, for the value of the land and damages, such sum as this court shall direct (allowing them the value of the crossing of the Midland road over the Morris and Essex road, under the agreement of April, 1872) for the land

taken and damages in the crossing permitted by this court.

That the prayer of the bill of E. Ellery Anderson, trustee, &c., will, so far as the road covered by complainants' mortgage is concerned, be denied.